RICHARDSON, SECRETARY OF HEALTH, EDU-
CATION, AND WELFARE *v.* BELCHER

No. 70–53.   Argued October 13, 1971—Decided November 22, 1971

*Richard B. Stone* argued the cause for appellant.   With
him on the brief were *Solicitor General Griswold, As-
sistant Attorney General Gray,* and *Kathryn H. Baldwin.*

*John Charles Harris* argued the cause and filed a brief
for appellee.

*William E. Miller* and *Richard A. Whiting* filed a brief
for the American Mutual Insurance Alliance et al. as
*amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by
*Edward J. Kionka* for the American Trial Lawyers As-
sociation, and by *Edward L. Carey, Harrison Combs,* and
*M. E. Boiarsky* for United Mine Workers of America.

MR. JUSTICE STEWART delivered the opinion of the
Court.

The appellee was granted social security disability
benefits effective in October 1968, in the amount of
$329.70 per month for himself and his family.   In Jan-
uary 1969, the federal payment was reduced to $225.30

monthly under the "offset" provision of Section 224 of the Social Security Act, 79 Stat. 406, 42 U. S. C. § 424a,[1] upon a finding that the appellee was receiving workmen's compensation benefits from the State of West Virginia in the amount of $203.60 per month. After exhausting his administrative remedies, the appellee brought this action challenging the reduction of payments required by § 224 on the ground that the statutory provision deprived him of the due process of law guaranteed

---

[1] Section 224 provides, in pertinent part:

"(a) If for any month prior to the month in which an individual attains the age of 62—

"(1) such individual is entitled to benefits under section 423 of this title, and

"(2) such individual is entitled for such month, under a workmen's compensation law or plan of the United States or a State, to periodic benefits for a total or partial disability (whether or not permanent), and the Secretary has, in a prior month, received notice of such entitlement for such month,

"the total of his benefits under section 423 of this title for such month and of any benefits under section 402 of this title for such month based on his wages and self-employment income shall be reduced (but not below zero) by the amount by which the sum of—

"(3) such total of benefits under sections 423 and 402 of this title for such month, and

"(4) such periodic benefits payable (and actually paid) for such month to such individual under the workmen's compensation law or plan,

"exceeds the higher of—

"(5) 80 percentum of his 'average current earnings,' . . .

.          .          .          .          .

"For purposes of clause (5), an individual's average current earnings means the larger of (A) the average monthly wage used for purposes of computing his benefits under section 423 of this title, or (B) one-sixtieth of the total of his wages and self-employment income (computed without regard to the limitations specified in sections 409 (a) and 411 (b) (1) of this title) for the five consecutive calendar years after 1950 for which such wages and self-employment income were highest. . . ." 42 U. S. C. § 424a (a).

by the Fifth Amendment. The District Judge, disagreeing with other courts that have considered the question,[2] held the statute unconstitutional. 317 F. Supp. 1294. The Secretary of the Department of Health, Education, and Welfare appealed directly to this Court under 28 U. S. C. § 1252.[3] We noted probable jurisdiction, 401 U. S. 935, and the case was briefed and argued on the merits. We now reverse the judgment of the District Court.

In our last consideration of a challenge to the constitutionality of a classification created under the Social Security Act, we held that "a person covered by the Act has not such a right in benefit payments as would make every defeasance of 'accrued' interests violative of the Due Process Clause of the Fifth Amendment." *Flemming* v. *Nestor,* 363 U. S. 603, 611. The fact that social security benefits are financed in part by taxes on an employee's wages does not in itself limit the power of Congress to fix the levels of benefits under the Act or the conditions upon which they may be paid. Nor does an expectation of public benefits confer a contractual right to receive the expected amounts. Our decision in *Goldberg* v. *Kelly,* 397 U. S. 254, upon which

---

[2] *E. g., Gambill* v. *Finch,* 309 F. Supp. 1 (ED Tenn. 1970); *Lofty* v. *Cohen,* 325 F. Supp. 285, aff'd *sub nom. Lofty* v. *Richardson,* 440 F. 2d 1144 (CA6 1971); *Bartley* v. *Finch,* 311 F. Supp. 876 (ED Ky. 1970); *Bailey* v. *Finch,* 312 F. Supp. 918 (ND Miss. 1970); *Benjamin* v. *Finch,* Civ. No. 32816, ED Mich., May 26, 1970, aff'd *sub nom. Benjamin* v. *Richardson,* No. 20,714, CA6, Apr. 29, 1971; *Gooch* v. *Finch,* Civ. No. 6840, SD Ohio, July 13, 1970; *Rodatz* v. *Finch,* Civ. No. 69–170, ED Ill., Sept. 4, 1970, aff'd *sub nom. Rodatz* v. *Richardson* (CA7 1971).

[3] "Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . , holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party."

the District Court relied, held that as a matter of procedural due process the interest of a welfare recipient in the continued payment of benefits is sufficiently fundamental to prohibit the termination of those benefits without a prior evidentiary hearing. But there is no controversy over procedure in the present case, and the analogy drawn in *Goldberg* between social welfare and "property," 397 U. S., at 262 n. 8, cannot be stretched to impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits.

To characterize an Act of Congress as conferring a "public benefit" does not, of course, immunize it from scrutiny under the Fifth Amendment. We have held that "[t]he interest of a covered employee under the [Social Security] Act is of sufficient substance to fall within the protection from arbitrary governmental action afforded by the Due Process Clause." *Flemming* v. *Nestor, supra,* at 611. The appellee argues that the classification embodied in § 224 is arbitrary because it discriminates between those disabled employees who receive workmen's compensation and those who receive compensation from private insurance or from tort claim awards. We cannot say that this difference in treatment is constitutionally invalid.

A statutory classification in the area of social welfare is consistent with the Equal Protection Clause of the Fourteenth Amendment if it is "rationally based and free from invidious discrimination." *Dandridge* v. *Williams,* 397 U. S. 471, 487. While the present case, involving as it does a federal statute, does not directly implicate the Fourteenth Amendment's Equal Protection Clause, a classification that meets the test articulated in *Dandridge* is perforce consistent with the due process requirement of the Fifth Amendment. Cf. *Bolling* v. *Sharpe,* 347 U. S. 497, 499.

To find a rational basis for the classification created by § 224, we need go no further than the reasoning of Congress as reflected in the legislative history. The predecessor of § 224, enacted in 1956 along with the amendments first establishing the federal disability insurance program, required a full offset of state or federal[4] workmen's compensation payments against benefits payable under federal disability insurance. 70 Stat. 816. It is self-evident that the offset reflected a judgment by Congress that the workmen's compensation and disability insurance programs in certain instances served a common purpose, and that the workmen's compensation programs should take precedence in the area of overlap. The provision was repealed in 1958, 72 Stat. 1025, because Congress believed that "the danger that duplication of disability benefits might produce undesirable results [was] not of sufficient importance to justify reduction of the social security disability benefits." H. R. Rep. No. 2288, 85th Cong., 2d Sess., 13.

In response to renewed criticism of the overlap between the workmen's compensation and the social security disability insurance programs, Congress re-examined the problem in 1965. Data submitted to the legislative committees showed that in 35 of the 50 States, a typical worker injured in the course of his employment and eligible for both state and federal benefits received compensation for his disability in excess of his take-home pay

---

[4] The primary federal workmen's compensation programs are the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U. S. C. § 901 *et seq.*, applicable to employees in the District of Columbia and in maritime-related occupations, and the Federal Employees' Compensation Act, 80 Stat. 532, 5 U. S. C. § 8101 *et seq.*, applicable to employees of the Federal Government. The overwhelming majority of workers in the United States are covered by state rather than federal programs, and thus we may refer generally to workmen's compensation as a program of the States.

prior to the disability. Hearings on H. R. 6675 before the Senate Committee on Finance, 89th Cong., 1st Sess., pt. 2, p. 904. It was strongly urged that this situation reduced the incentive of the worker to return to the job, and impeded the rehabilitative efforts of the state programs. Furthermore, it was anticipated that a perpetuation of the duplication in benefits might lead to the erosion of the workmen's compensation programs.[5] The legislative response was § 224, which, by limiting total state and federal benefits to 80% of the employee's average earnings prior to the disability, reduced the duplication inherent in the programs and at the same time allowed a supplement to workmen's compensation where the state payments were inadequate.

The District Court apparently assumed that the only basis for the classification established by § 224 lay in the characterization of workmen's compensation as a "public benefit." Because the state program was financed by employer contributions rather than by taxes, the court held that the "public" characterization afforded no rational basis to distinguish workmen's compensation from private insurance. We agree that a statutory discrimination between two like classes cannot be rationalized by assigning them different labels, but neither can two unlike classes be made indistinguishable by attaching to them a common label. The original purpose of state workmen's compensation laws was to satisfy a need in-

---

[5] The Senate Committee on Finance, with which the 1965 amendment originated, took note of "the concern that has been expressed by many witnesses in the hearings about the payment of disability benefits concurrently with benefits payable under State workmen's compensation programs." S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 100. Testimony concerning the anticipated effects of duplication upon the future of the state programs appears in Hearings on H. R. 6675 before the Senate Committee on Finance, 89th Cong., 1st Sess., pt. 1, pp. 252, 259, 366, pt. 2, pp. 540, 738–740, 892–897, 949–954, 990.

adequately met by private insurance or tort claim awards. Congress could rationally conclude that this need should continue to be met primarily by the States, and that a federal program that began to duplicate the efforts of the States might lead to the gradual weakening or atrophy of the state programs.

We have no occasion, within our limited function under the Constitution, to consider whether the legitimate purposes of Congress might have been better served by applying the same offset to recipients of private insurance, or to judge for ourselves whether the apprehensions of Congress were justified by the facts. If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause of the Fifth Amendment.

The judgment is

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

I would affirm the judgment of the District Court. The statutory classification upheld today is not "rationally based and free from invidious discrimination." *Dandridge* v. *Williams,* 397 U. S. 471, 487. It is, in my view, violative of the Federal Government's obligation under the Fifth Amendment's Due Process Clause to guarantee to all citizens equal protection of the laws. *Bolling* v. *Sharpe,* 347 U. S. 497.

Eligibility for social security disability benefits is premised upon a worker's having attained "insured" status in the course of an employment "covered" by the Act. It is undisputed that Raymond Belcher, and through him his wife and two minor children, had so qualified in 1968 when he broke his neck while employed by the Pocahontas Fuel Co. in Lynco, West Virginia. Indeed, his application for such benefits has been approved, and the benefits authorized and paid.

Section 224 of the Social Security Act, however, requires that these benefits be substantially reduced solely because Belcher also receives state workmen's compensation payments. It is said that the duplication of benefits impedes rehabilitation, and may lead to a cutting back of state workmen's compensation programs. *Ante,* at 83.

The rehabilitation goal does not explain the special treatment given to workmen's compensation beneficiaries. There are many other important programs, both public and private, which contain provisions for disability payments affecting a substantial portion of the work force, and which do not require an offset under the Social Security Act.

Thus, had Belcher's supplemental disability payment come from a Veterans' Administration program,[1] a Civil Service Retirement Act [2] or Railroad Retirement Act [3]

---

[1] In fiscal 1970, over 2,000,000 veterans received compensation for service-connected disabilities under statutes administered by the Veterans' Administration. Statistical Abstract of the United States 264 (1971) (hereinafter cited as Statistical Abstract). See generally 38 U. S. C. § 301 *et seq.* Benefits are also provided to certain veterans for non-service-connected disabilities. See generally 38 U. S. C. § 501 *et seq.* In 1967, total disability benefits from all Veterans' Administration programs amounted to $3,197,906,000. Berkowitz & Johnson, Towards An Economics of Disability: The Magnitude and Structure of Transfer and Medical Costs, 5 J. Human Resources 271, 282 (1970) (hereinafter cited as Economics of Disability). Raymond Belcher indicated on his application for social security disability benefits that he served for three years during World War II. Transcript of Hearings before Appeals Council 37. The record is silent, however, as to his potential eligibility for non-service-connected veteran's benefits.

[2] Employees covered by the Civil Service Retirement Act, 5 U. S. C. § 8301 *et seq.,* are entitled to a disability annuity after five years of civilian service. *Id.,* § 8337. In fiscal 1970, there were 184,000 disabled annuitants. Statistical Abstract 284.

[3] Title 45 U. S. C. § 228a *et seq.* provides disability benefits for railroad workers with 10 or more years of covered service. Covered

annuity, a private disability insurance policy,[4] a self-insurer,[5] a voluntary wage-continuation plan, or the proceeds in an action in tort arising from the disabling injury, there would have been no reduction in his social security benefits. The offset under § 224 applies only to federal social security disability beneficiaries also receiving workmen's compensation payments, a group which in 1965 totaled only 1.4% of all social security disability bene-

employment under this Act and the Civil Service Retirement Act is excluded from coverage under the Social Security Act. If, however, a worker's employment history separately qualifies him for dual coverage, supplemental payments under neither of these Acts results in an offset of social security disability payments. HEW publication, Social Security Programs in the United States 46, 108 (1968) (hereinafter cited as Programs).

[4] Participation in West Virginia's state workmen's compensation fund is optional with the employer. W. Va. Code Ann. §§ 23–2–1, 23–2–8 (1970). An employer who declines to participate, however, must provide equivalent benefits through private insurance or as a self-insurer. *Id.,* at § 23–2–9. Had the Pocahontas Fuel Co. elected to pay premiums to a private carrier rather than to the state fund—a decision over which Mr. Belcher presumably had no control other than that which might be exerted through the collective-bargaining process—the private insurance benefits would not have been offset under § 224. Over 26,000,000 employees are covered by some sort of private insurance program. Programs 115. In 1967, disability benefits from private insurance amounted to 1.3 billion dollars. Economics of Disability 278. This figure alone exceeded the total of all benefits paid by workmen's compensation programs for that year. *Ibid.*

[5] Were Mr. Belcher's employer large enough, it might have determined to become a self-insurer with respect to employee disability claims. Disability payments from self-insurers were required by state law to be at least equivalent to benefits available through the state fund, n. 3, *supra,* and they would also not be offset under § 224.

In 1969, employers who were covered by private carriers and who were self-insurers paid a combined total of $2,008,000,000 in benefits. State and federal workmen's compensation funds paid only $604,-000,000 in benefits. Statistical Abstract 289.

ficiaries.[6] Yet, of the 849,000 disabled workers who in 1965 received social security disability benefits,[7] over *sixteen* percent also received overlapping veteran's benefits,[8] and almost *fourteen* percent received benefits from private insurance maintained under the auspices of an employer or a union.[9] Congress is, of course, not required to address itself to all aspects of a social problem in its legislation. It must, however, justify the distinctions it draws between people otherwise similarly situated. Rehabilitation incentives are not a rational justification for the discrimination worked by § 224.[10] If it is at all rational to argue that duplicating payments "impede rehabilitation," the argument must apply to all such payments regardless of their source. The nature of the supplemental benefit has no relation to a worker's incentive to return to work.

Nor is § 224 designed to stem a possible "erosion" of state workmen's compensation plans. As MR. JUSTICE MARSHALL points out, *post,* at 94, § 224 itself provides that there shall be no reduction of federal social security benefits with respect to those state workmen's compensation plans which themselves offset federal social security

---

[6] 1966 Survey of Disabled Adults, Office of Research & Statistics, Social Security Administration, Table 5 (hereinafter cited as Survey). This figure was confirmed during the hearings which led to the adoption of § 224 by Anthony J. Celebrezze, then Secretary of the Department of Health, Education, and Welfare. Hearings on H. R. 6675; before the Senate Committee on Finance, 89th Cong., 1st Sess., pt. 1, p. 152.

[7] Survey, Table 5.

[8] *Ibid.*

[9] *Ibid.*

[10] Assuming the rationality of rehabilitation as a goal with respect to temporary disabilities, there is still no justification for applying an offset with respect to disabilities concededly permanent in nature. Nevertheless, the statute requires this to be done. The record does not reveal the status of Mr. Belcher's disability.

benefits against state payments. Thus, the statute encourages States concerned about overcompensation of disabled workers to cut back on their own programs. But the "rational basis" discerned by the majority requires the statute to have precisely the opposite purpose.

I would affirm the judgment of the District Court.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

In my view, the offset provision of § 224 of the Social Security Act, 42 U. S. C. § 424a, 79 Stat. 406, creates an unlawful discrimination under the Due Process Clause of the Fifth Amendment.

Before this 53-year-old appellee became disabled in March 1968, he was supporting his wife and two children on total yearly earnings of approximately $6,600. Once disabled, he could not work, but he and his family were awarded federal social security disability benefits totaling $329.70 per month.[1] Because his employer had chosen to set up a workmen's compensation fund, appellee also became entitled to workmen's compensation benefits totaling $203.60 per month. These were his only forms of disability compensation. Had appellee been allowed to keep his initial award of federal benefits, his income would have totaled nearly $6,400 a year, somewhat less than he had earned before his disability. But because of the offset provision of § 224, appellee's monthly federal payments were reduced, solely because the supplement to his federal benefits was in the form

---

[1] The test for disability under the federal statute is a stern one. With an exception for elderly blind people, disability means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U. S. C. § 423 (d) (1) (A).

of state workmen's compensation. As a result, appellee's total yearly income was reduced to $5,146.80.

Appellee complains that the offset provision is unconstitutional because it places its severe burden on a single class of disabled persons without adequate justification. Under the challenged offset provision, federal social security disability benefits are reduced only for those persons whose disability entitles them to workmen's compensation. Other persons who receive other kinds of disability compensation—for example, private insurance benefits or tort damages—are allowed the full amount of federal social security benefits. The question here is whether workmen's compensation beneficiaries may be singled out in this way for a reduction in federal benefits.

Starting from the assumptions that federal social security insurance, like welfare assistance, is a "public benefit" in which the beneficiaries have neither contract nor property interests, and that statutory classifications affecting the basic needs of individuals are viewed no differently under the Constitution from classifications in the area of business regulation, the Court concludes that the classification here has a reasonable basis and is consistent with the Fifth Amendment. To reach today's result, the Court revitalizes *Flemming* v. *Nestor*, 363 U. S. 603 (1960),[2] and extends the doctrine of *Dandridge* v. *Williams*, 397 U. S. 471 (1970), to statutory classifications under *federal* law.[3] Thus, the Court to-

---

[2] *Flemming* was a 5–4 decision upholding a federal statute that terminated the old-age benefits of the family of a fully eligible worker, because he was deported as a former member of the Communist Party. The case has not met with unanimous critical acclaim. See Reich, The New Property, 73 Yale L. J. 733, 768–771, 775 (1964). Prematurely, it would appear, some scholars had predicted its demise. *E. g.*, The Supreme Court, 1969 Term, 84 Harv. L. Rev. 1, 103–104 (1970).

[3] In *Dandridge*, the Court held that a State's maximum grant regulation for welfare recipients did not unconstitutionally dis-

day holds that Congress can take social security benefits from a disabled worker as long as it does not behave in an "arbitrary" way; classifications in the federal social security law are consistent with the Fifth Amendment if they are "rationally based and free from invidious discrimination."

In opposing this course, I adhere to my dissenting views in *Dandridge* v. *Williams.* I continue to believe that the "rational basis" test used by this Court in reviewing business regulation has no place when the Court reviews legislation providing fundamental services or distributing government funds to provide for basic human needs. In deciding whether a given classification is consistent with the requirements of the Fifth or Fourteenth Amendment,[4] we should look to "the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state [or federal] interests in support of the classification." *Dandridge* v. *Williams, supra,* at 521 (MARSHALL, J., dissenting); cf. *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968). Under this approach, it is necessary to consider more than the character of the classification and the governmental interests in support of the classification. Judges should not ignore what everyone knows, namely that legislation regulating business cannot be equated with legislation dealing with destitue, disabled, or elderly individuals. Thus, in assessing the lawfulness of the special disadvantages suffered here by workmen's

---

criminate between children in large and small families. The regulation was challenged under the Equal Protection Clause of the Fourteenth Amendment.

[4] I would use essentially the same approach when statutory classifications are challenged under either Amendment. Cf. *Bolling* v. *Sharpe,* 347 U. S. 497 (1954).

compensation beneficiaries, the Court should consider the individual interests at stake. Federal disability payments, even when supplemented by other forms of disability compensation, provide families of disabled persons with the basic means for getting by. I would require far more than a mere "rational basis" to justify a discrimination that deprives disabled persons of such support in their time of need.

It is unnecessary to elaborate further the analysis required by the principles of my *Dandridge* dissent. For even under the Court's "rational basis" test, the discriminatory offset provision here cannot be sustained. There simply is no reasonable basis for singling out recipients of workmen's compensation for a reduction of federal benefits, while those who receive other kinds of disability compensation are not similarly treated.

This is not to say that an offset scheme is intrinsically impermissible. Arguably, Congress has an interest in paying greater benefits to people who are relying completely on the federal social security program, and lesser benefits to people who have other sources of disability compensation. But the question here is not whether Congress has the power to prevent "duplicative" payments that might exceed previous take-home pay and might thereby discourage disabled workers from returning to work.[5] The issue is whether Congress may single

---

[5] The offset idea has had a rocky history. As the majority notes, a prior offset provision was repealed in 1958 because Congress believed that "the danger that duplication of disability benefits might produce undesirable results [was] not of sufficient importance to justify reduction of the social security disability benefits." H. R. Rep. No. 2288, 85th Cong., 2d Sess., 13. The present offset provision was restored to the Act in 1965. It was estimated at the time that no more than 2% of the federal social security disability beneficiaries also received workmen's compensation. Hearings on

out for the purpose of applying the offset only those who are receiving workmen's compensation, and exclude those who are receiving similar supplemental disability compensation from other sources. A concern about excessive combined benefits and "rehabilitation" does not explain that distinction.

What, then, is the "rational basis" for the disfavored treatment of persons receiving workmen's compensation? The majority, in its conclusory treatment of this question, appears to say that workmen's compensation "satisf[ies] a need" which is special; and, claiming to rely on "the reasoning of Congress as reflected in the legislative history," the majority finds that Congress "anticipated that a perpetuation of the duplication in benefits might lead to the erosion of the workmen's compensation programs." I cannot accept that argument as a justification for this statute. There is nothing in the Senate, House, or Conference Reports indicating that this was the basis for the legislation actually passed.[6] And I do not think that the argument is in fact rational. The statutory discrimination exceeds the maximum amount of irrationality and arbitrariness countenanced by the Fifth Amendment.

Workmen's compensation programs serve precisely the same function as other forms of disability insurance and

---

H. R. 6675 before the Senate Committee on Finance, 89th Cong., 1st Sess., pt. 1, p. 152.

It is perhaps plausible to reason that duplicative benefits might in some circumstances discourage rehabilitation and a return to work. It is worth noting, however, that even without the offset provision, appellee's combined benefits would not have exceeded his earnings before disability. See *supra*, at 88.

[6] The sole concern expressed in these documents is that Congress should prevent "excessive combined benefits." S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 100; see also H. R. Conf. Rep. No. 682, 89th Cong., 1st Sess.; H. R. Rep. No. 213, 89th Cong., 1st Sess.

tort damage suits. The payments assist workers in the same way, and satisfy the same need. Indeed, in appellee's home State of West Virginia, as in most States, workmen's compensation is by statute the complete functional equivalent of tort liability, since employers who participate in workmen's compensation cannot be sued for tort damages by disabled employees. W. Va. Code Ann. § 23–2–6. Moreover, no distinction can be drawn on the basis of the source of the payments. In West Virginia, as in most States, workmen's compensation is financed privately, just like other forms of insurance and like tort damages. Usually the benefits are paid directly by the employer (as a self-insurer) or by the employer's insurance carriers (in which case the employer pays the premiums). See 3 A. Larson, Law of Workmen's Compensation § 92.10, p. 444 (1971); W. Va. Code Ann. § 23–2–1 *et seq.* I see no basis for singling out workmen's compensation programs for special protection or solicitude.

More pointedly, however, it defies logic to claim that § 224 could to any extent protect or encourage workmen's compensation in the manner suggested by the Court. In support of its claim that § 224 might discourage the erosion of workmen's compensation, the appellant relies heavily on a statement made by a representative of the Council of State Chambers of Commerce to the Senate Committee on Finance:

> "A matter of equal concern is the impact of Federal disability payments on State workmen's compensation programs. Legislative proposals have been offered in several States (Colorado, Florida, Maryland, and Minnesota) to reduce workmen's compensation benefits by the amount of [social security] disability benefits payable to a disabled worker. If other States follow this direction . . . we believe it

will be only a matter of time until State workmen's compensation programs are destroyed." Hearings on H. R. 6675 before the Senate Committee on Finance, 89th Cong., 1st Sess., pt. 1, p. 259.

In addition, the Government refers to the testimony of another Chamber of Commerce representative:

"Encroachment by social security is hampering efforts to improve the State workmen's compensation systems where improvements are needed. Faced with sharply rising costs and the duplication of benefits, employers in several States have supported legislative proposals to reduce workmen's compensation benefits by the amount of social security disability benefits." *Id.,* at 252.

I am unable to see how § 224 is connected to this asserted rationale. The federal offset provision provides for the reduction of *federal* benefits if the total of those benefits and the workmen's compensation benefits exceeds 80% of "average current earnings." However, federal benefits may not be reduced if the workmen's compensation plan provides for a reduction of *its* benefits in the event of an overlap. § 224 (d). Thus, if a State or employers in the State want to save money, the federal statute invites them to reduce workmen's compensation benefits by means of an offset provision of their own. I do not see how it is possible to argue that the federal statute is designed to prevent States from adopting their own offset provisions. If anything, the States are encouraged to cut back on their programs.[7]

---

[7] Indeed, where they are free to do so, see 3 A. Larson, Law of Workmen's Compensation 522, Appendix A, Table 7 (1971); W. Va. Code Ann. §§ 23-2-1, 23-2-8, individual workers are encouraged to opt out of workmen's compensation and purchase private disability insurance.

Even if it were possible to believe that the challenged federal offset provision might in some way forestall States and employers from creating offset provisions in their workmen's compensation programs, I do not see how state offset provisions could to any degree "lead to the gradual weakening or atrophy of [those] programs." *Ante,* at 84.[8] How do offset provisions hurt a program? It is as preposterous to suggest that state offset provisions could lead to the destruction of workmen's compensation as it would be to argue that the current federal offset provision might destroy the federal social security program. Such manufactured and totally illusory concerns cannot be deemed rational.

The plain fact is that Congress passed this offset provision because it thought disabled persons should not receive excessive combined disability payments. Perhaps by oversight,[9] it arbitrarily singled out workmen's compensation benefits from the universe of disability compensations, and required that workmen's compensation *alone* was to be offset against federal social security. If the majority's "rational basis" test in fact is to have any meaning, Congress cannot be permitted to single out recipients of workmen's compensation for this adverse

[8] It is worth noting that payments for total and permanent disability are only a small part of the total scheme of compensation of any workmen's compensation act. Benefits are also provided for medical and hospital expenses, funeral expenses, rehabilitation, specific scheduled losses, temporary disability, and other forms of loss, see, *e. g.,* W. Va. Code Ann. §§ 23-4-3, 23-4-4, 23-4-6, all of which are unaffected by social security.

[9] Secretary of HEW Celebrezze opposed the present offset provision, arguing that any change should await a more thorough study of the overlap problem. Hearings on H. R. 6675 before the Senate Committee on Finance, 89th Cong., 1st Sess., pt. 1, p. 146. The Committee chose not to wait.

treatment. The burden of reduced federal benefits—so devastating to the families of the once-working poor—cannot be imposed arbitrarily under the Fifth Amendment. In my view, that has happened here. I dissent.[10]

---

[10] Since, in my view, the present discriminatory offset provision cannot stand, there is no need to decide finally whether Congress has the power to pass an offset provision that would qualify an already accrued interest in social security benefits. Whatever might be said about the characterization of welfare assistance as "property," see *Goldberg* v. *Kelly*, 397 U. S. 254, 262 n. 8 (1970), surely a worker who is forced to pay a social security tax on his earnings has a clearly cognizable contract interest in the benefits that justify the tax. The chacterization of this interest as "noncontractual" in *Flemming* v. *Nestor*, 363 U. S. 603, 611 (1960), is, in my view, incorrect. The analogy to an annuity or insurance contract, rejected there, seems apt. *Id.*, at 624 (Black, J., dissenting). See also Reich, The New Property, *supra*. Of course, as the Court says, Congress may "fix the levels of benefits under the Act or the conditions upon which they may be paid." But once Congress has fixed that level and those conditions, and a worker has contributed his tax in accord with the law, may Congress unilaterally modify the benefits in a way that defeats the expectations of beneficiaries and prospective beneficiaries? At the least, it would seem that after a worker has contributed the tax for 20 quarters, 42 U. S. C. § 423 (c) (1), and his interest in the benefits has fully accrued, Congress may not unilaterally qualify that interest by introducing an offset provision not previously contemplated by the parties.