LEAGUE OF VOLUNTARY HOSPITALS
AND HOMES OF NEW YORK et al.,
and the Cost of Living Council, Plain-
tiffs-Appellees,

v.

LOCAL 1199, DRUG AND HOSPITAL
UNION et al., Defendants-
Appellants.

No. 2–10.

Temporary Emergency Court of Appeals.

Dec. 20, 1973.

Leonard B. Boudin, Rabinowitz, Boudin & Standard, New York City (Sipser, Weinstock, Harper & Dorn, New York City, on the brief), for defendants-appellants.

Allen W. Hausman, Atty., U. S. Dept. of Justice, Washington, D. C. (Irving Jaffe, Acting Asst. Atty. Gen., Paul J. Curran, U. S. Atty., Steven J. Glassman, Asst. U. S. Atty., William E. Nelson, Bruce G. Forrest, Attys., Dept. of Justice, on the brief), Howard L. Ganz, Proskauer, Rose, Goetz & Mendelsohn, New York City (William J. Abelow, New York City, on the brief), for plaintiffs-appellees.

Before TAMM, Chief Judge, and HASTIE and ESTES, Judges.

ESTES, Judge.

This is an appeal, pursuant to Section 211 of the Economic Stabilization Act of 1970, as amended, (the Act) from orders entered on November. 9, 1973, by the United States District Court for the Southern District of New York granting plaintiffs a preliminary injunction enjoining the defendant Local 1199, Drug and Hospital Union (Union) and its officers from continuing a strike at the hospitals represented by the plaintiff League of Voluntary Hospitals and Homes of New York (League), and adjudging the Union and its officers in civil contempt for violations of a temporary restraining order.

The Union has been in contractual relations with the League since 1968. The Union has about 50,000 employees engaged in maintenance, technical, clerical, and professional work. The League is an unincorporated association of approximately 33 voluntary hospitals and

homes which provide medical treatment and care for some 20,000 resident patients.

On June 29, 1972 an arbitration panel issued an award pursuant to Section 716 of the New York State Labor Law providing for a two-year contract between the League and the Union. The contract provides for wage increases of $12 per week or 7½%, whichever is greater, on July 1, 1972 and July 1, 1973. The first year's wage increase was approved after consideration by the Cost of Living Council (CLC), as required by Subpart I (Special Rules Applicable to Providers of Health Services) of 6 C.F.R. Part 150 (Phase IV Price Regulations). Approval of the second year's wage increase was sought on July 23, 1973. The application was placed on the agenda of the Tripartite Health Industry Wage and Salary Committee (Committee) for its September 12, 1973 meeting. In order to gain additional information on the wage structure in the New York area, action was deferred to the October 12, 1973 meeting. At the request of the labor members of the Committee, action was further deferred to the October 25, 1973 meeting, which was later postponed until October 30, 1973. At this meeting the staff of the CLC's Health Division presented the case, and reported that none of the employees covered by the arbitration award came within the statutory exemption for employees earning substandard wages [Section 203(d) of the Act]. Action on the application was deferred at the request of the labor members until the scheduled November 30, 1973 meeting.

On November 1, 1973, the League filed a complaint in district court, pursuant in part to Section 210 of the Act, applying for injunctive relief to prevent the Union from organizing, inducing, or encouraging a work stoppage which was being threatened in an attempt to compel the League to pay the unapproved wage increase. Plaintiff's claim was also based upon Sections 713 and 716 of the New York Labor Law which prohibits and provides for the enjoining of

strikes at plaintiff hospitals, justifying the exercise of pendent jurisdiction by the trial court. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). A temporary restraining order (t. r. o.) was issued, pending the determination of the motion, forbidding interference with the operation of League members and directing the Union to take all appropriate measures to prevent the threatened work stoppage and to inform its members of the order. On November 5, 1973, a hearing was held on the application for a preliminary injunction, at which the Union moved to dismiss the complaint and vacate the t. r. o. on grounds that Subpart I of 6 C.F.R. Part 150 invidiously discriminates against it and lacks any rational relationship to the expressed purpose of the Act and is thus unconstitutional. The League moved for an order adjudging the Union in contempt of court for striking in violation of the t. r. o. The court extended the t. r. o. and set both motions for hearing on November 8, 1973. At the November 8 hearing, the Cost of Living Council (CLC) was made a party plaintiff, and affidavits were introduced in support of the decision to retain mandatory controls on the health industry. The court then announced that it was issuing the preliminary injunction requested, adjudicating the Union in contempt for violating the t. r. o., and imposing fines which the Union was excused from paying if it immediately ended the strike. The CLC was ordered to meet no later than November 10, 1973 to consider and determine the application for a wage increase. Such orders were filed on November 9, 1973. On November 10, 1973, the CLC applied for and received a stay pending appeal granted by Chief Judge Tamm of this Court. On November 11, 1973, CLC met and approved a wage increase substantially less than that provided by the arbitration award. On November 12, 1973, the strike was ended after a Union membership vote. Notice of appeal was filed with this Court by CLC on November 10, 1973 from that

part of the district court's order which directed it to determine the wage increase application, but that appeal has been dismissed by stipulation of the parties and the issue is not before us. On November 16, 1973, the Union and its officers filed their notice of appeal with this Court. As provided by this Court's order granting CLC's motion for a stay of the district court's orders, the parties were required to adhere to an expedited briefing schedule and oral argument was set for December 14, 1973. Defendants filed a motion and affidavits opposing this procedure, and plaintiffs filed affidavits supporting it. On November 28, 1973, this Court entered an order denying defendants' motion.

■■■ The defendants raise numerous issues on this appeal. Regarding their challenge of the district court's grant of preliminary injunctive relief to plaintiffs, district courts must apply the following standards:

> The movant must show a substantial likelihood of success on the merits, and that irreparable harm would flow from the denial of an injunction. In addition, the trial judge must consider the inconvenience that an injunction would cause the opposing party, and must weigh the public interest as well.

McGuire Shaft & Tunnel Corp. v. Local Union 1791, 475 F.2d 1209, 1215–1216 (T.E.C.A.), cert. denied, 412 U.S. 958, 93 S.Ct. 3008, 37 L.Ed.2d 1009 (1973). In accord, Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council, 481 F.2d 1388 (T.E.C.A.1973). Appellate review of the district court's determination is limited, because the issuance of a preliminary injunction is a matter committed to the sound judicial discretion of the trial court, Public Service Comm'n v. Wisconsin Telephone Co., 289 U.S. 67, 53 S.Ct. 514, 77 L.Ed. 1036 (1933); and can be overturned by an appellate court only where it has been a clear abuse of discretion. A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969); McGuire, supra, 475 F.2d at 1216.

■■■ The first issue raised by defendants, a preliminary one, is the contention that they were denied due process because of this Court's order reducing their briefing time, which they allege was in violation of the Court's own rules. We find this contention to be without merit. Section 211(b)(1) of the Act provides that this Court "shall . . . expedite the determination of cases over which it has jurisdiction . . . ." Rule 31(a) of the Federal Rules of Appellate Procedure, made applicable by this Courts General Rule 1 and authorized by Section 211(b)(1) of the Act, specifically empowers this Court, if it is "prepared to consider cases on the merits promptly after briefs are filed, and its practice is to do so," to shorten the time for the service and filing of briefs by, inter alia, "order for specific cases."[1]

■■ The second issue raised by defendants is that the Norris-LaGuardia Act, 29 U.S.C. § 107, prohibits the issuance of injunctions in labor disputes, and thus it should have been applied by the court below by refusing to grant plaintiffs the injunctive relief they sought. This Court has rejected this contention in a case involving a fact situation quite similar to this one. McGuire Shaft & Tunnel Corp. v. Local Union No. 1791, 475 F.2d 1209 (T.E.C.A.), cert. denied, 412 U.S. 958, 93 S.Ct. 3008, 37 L.Ed.2d 1009 (1973).

■■ The third issue raised by defendants is the validity of the CLC's regulations which impose mandatory controls on the wages of workers in the health industry. They contend that the regulations were not issued in accordance with the congressional mandate,

---

[1]. Section 211(b) of the Act provides that, with exceptions not relevant, this Court "shall have the powers of a circuit court of appeals with respect to the jurisdiction conferred on it by this title. The court shall ■■ exercise its powers and prescribe rules governing its procedure in such manner as to expedite the determination of cases over which it has jurisdiction under this title."

and that the maintenance of mandatory controls on the health industry while lifting them from most of the economy is an arbitrary and capricious classification lacking a rational justification, in violation of the Fifth Amendment. In regard to the contention that the regulations are invalid because not issued in accordance with the requirements of the Act, defendants point principally to Section 202(b) of the May 1971 amendments to the Act (P.L. 92–15) and present Section 203. Former Section 202(b) (of the May 1971 amendments) provided:

> (b) The authority conferred on the President by this section shall not be exercised with respect to a particular industry or segment of the economy unless the President determines, after taking into account the seasonal nature of employment, the rate of employment or underemployment, and other mitigating factors, that prices or wages in that industry or segment of the economy have increased at a rate which is grossly disproportionate to the rate at which prices or wages have increased in the economy generally.

However, Section 202(b) is no longer in the Act; it was replaced by the December 1971 amendments (P.L. 92–210). Under Section 203(a), the President "is authorized to issue such orders and regulations as he deems appropriate, accompanied by a statement of reasons for such orders and regulations, . . . " to stabilize prices, etc. Defendants argue that no formal findings were made or reasons stated by the President or CLC in support of the retention of controls on the health industry. They point out that the Phase III Executive Order (No. 11695) and the Phase III and IV regulations do not contain formal findings or reasons. The CLC Phase IV regulations now in effect provide that the health industry remains subject to the mandatory controls in effect on January 10, 1973, that is, the Phase II controls. A White House background paper on Phase II announced the establishment of a Committee on the Health Services Industry, emphasizing that "costs of medical care have been a dramatically rising part of the family budget," and that the application of controls to health care costs presented "special difficulties . . . . " Phase III regulations, 6 C.F.R. §§ 130 et seq., were issued on January 11, 1973, and lifted mandatory controls except those over the food, health, and construction industries. These regulations, together with a Presidential message to Congress and a White House fact sheet on Phase III, were published at 38 Fed.Reg. 1479. In his message to Congress, the President noted that the requirement for prior approval of changes in prices and wages was being limited to "special problem areas." According to the President, the continuation of controls in these areas required "special efforts" to combat inflation. We hold that the President has adequately indicated the reasons, as prescribed by Section 203, for retention of controls on the health industry, and that he has exercised his authority after making the appropriate determination as *would have been* required by former Section 202(b). The affidavit of Dr. John T. Dunlop, Executive Director of the CLC, considered by the district court, contains detailed reasons why such a determination was made. Therefore, the regulations were not issued in violation of the statutory mandate. Similar selective controls have been upheld by this Court as not arbitrary or capricious or in excess of statutory authority when the evidence showed that the controls were an attempt to reduce inflation in an area of the economy that had been particularly inflationary. Pacific Coast Meat Jobbers Association, Inc. v. Cost of Living Council, 481 F.2d 1388 (T.E.C.A.1973).

■ In regard to defendants' argument that the regulations are an unconstitutional discrimination against workers in the health industry, we must determine whether there is a rational basis for the discrimination. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25

L.Ed.2d 491 (1970), quoted in Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).[2] While there was conflicting evidence in the court below, that court decided that the controls were a reasonable attempt to reduce inflation, and not unconstitutional. Without detailing the evidence, it is sufficient to say that the decision of the district court is supported by substantial evidence in the record. This Court has held that selective controls similar to those in this case are not unconstitutional if a rational basis is shown. Western States Meat Packers Association v. Dunlop, 482 F.2d 1401 (T.E.C.A. 1973); Local Union No. 11, I. B. E. W. v. Boldt, 481 F.2d 1392 (T.E.C.A.1973).[3]

■ The defendants also contend that the district court erred in not certifying to this Court the constitutional questions they raised. Section 211(c) requires, and this Court's Rules 32 and 33 provide, such a procedure where the district court determines that "substantial" constitutional issues are being raised. In the proceedings below, the district court, "based upon a review of the case law, legislative history, and relevant background material, [was] unable to conclude that the regulation is clearly unconstitutional or presents a substantial constitutional issue." The district court therefore properly declined to certify the constitutional issues.

2. "The Supreme Court, in Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed. 2d 231 (1971), holds that federal statutes are consistent with the due process clause of the Fifth Amendment if they meet the rational basis test enunciated in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), as follows:
'In the areas of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." . . . 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' . . . "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." ' "
Western States Meat Packers Ass'n, Inc. v. Dunlop, 482 F.2d 1401, 1405 (T.E.C.A.1973).

3. "Classifications such as those involved in the instant case must be upheld if the court can perceive any rational basis for the distinctions which they draw. 'It is enough that the [Government's] action be rationally based and free from invidious discrimination.' Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). The burden is upon Local 11 to show that the treatment or classification made is without rational basis or invidious in nature. Dandridge v. Williams, supra; Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Lindsley v.

Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). * * * "As stated in Williamson v. Lee Optical Co., supra:
'The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.
  *       *       *       *       *
'The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Tigner v. Texas, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Semler v. Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The legislature may select one phase of one field and apply a remedy there, neglecting the others. A.F. of L. v. American Sash Co., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. . . .' 348 U.S. 488, 489, 75 S.Ct. 464, 465. See also Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1077–87.
"The classifications apparent in the instant case certainly comport with the expansive due process and equal protection standards set forth in Williamson and other similar Supreme Court cases." *Id.*, 481 F.2d at 1395.

Finally, defendants argue on various grounds that the contempt fines imposed by the court below are invalid. None of these grounds was raised in the court below. The district court found that the defendants, with full knowledge of the t. r. o., organized, encouraged, and began a strike on November 5, 1973, and continued the strike until November 12, 1973. There were also undisputed findings that acts of violence were committed by union members, that hospital personnel were accosted and threatened, that picket lines around League hospitals were preventing the delivery of needed medical supplies, food, and fuel, and that the City of New York had declared a health emergency. The court imposed a $500,000 fine on Local 1199, a $10,000 fine on defendant Davis, the president of the local, and fines of $7,500 each on the other officers of the local. The district court's order imposing the fines explicitly stated that they were designed solely "to secure compliance" with the court's orders. All of the fines were to be suspended if the strike were ended immediately. Additional lesser fines were to be imposed for each day the strike continued. Defendants contend that these coercive fines are illegal because of the court's failure to follow the mandate of the Supreme Court to "consider the amount of defendant's financial resources and consequent seriousness of the burden to that particular defendant." United States v. United Mine Workers of America, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). While there was no hearing expressly directed to this particular factor, there was in the record substantial information concerning the organization and finances of the Union from which the court could have concluded that the fines were not excessive. Defendants did not contest the amounts of the fines or seek to introduce testimony as to their burden. Instead, they deliberately chose to continue the strike in violation of both the New York Labor Law and the t. r. o. In view of the grave emergency that was facing the district court,

the contumacy of the defendants, the fact that the court had evidence before it of the defendants' ability to pay, and the fact that the fines would have been suspended if defendants had complied with the t. r. o., we hold that the fines imposed were not excessive.

On November 7, 1973, the district court entered an order extending the t. r. o. "pending the determination of plaintiffs' motion for a preliminary injunction or until the expiration of five days after the entry of this order, whichever is sooner. . . ." Thus, under Rule 65 of the Federal Rules of Civil Procedure, there is no question that the t. r. o. was in full force and effect until the preliminary injunction issued. During the proceedings on November 8, 1973, the court, in stating his decision, first indicated his determination that a preliminary injunction would issue, and then dealt with the matter of contempt. Defendants make the argument that the court was without power to fine them for contempt of the t. r. o., since it was no longer in effect, they assert, because it had been continued only until the determination of the motion for a preliminary injunction. We reject this contention. The defendants were under one uninterrupted injunctive restraint. The decision to impose contempt penalties was made during the same proceedings in which the decision was made to grant the application for preliminary injunction. Separate orders imposing the fines and issuing the preliminary injunction were entered on November 9, 1973. The defendants could have avoided all penalties by simply complying with the preliminary injunction. It is undisputed, in fact, conceded, by defendants, that they deliberately violated—"flouted"—the t. r. o. and the preliminary injunction and that defendants were fully apprised of the seriousness of breaching the court's orders. The Union's president, defendant Davis, stated when the court's order was announced, "We can either accept it or face the penalties." Record at p. Q–111. We hold it was within the court's lawful

authority to give the Union the choice either to stop the illegal strike as they had been ordered to do or to face fines for their past and continuing contumacious acts.

In the circumstances that existed when the defendants were adjudged in contempt, the large fines imposed by the court as a means of compelling compliance with its orders were appropriate and in no way arbitrary. However, if the defendants believe that the settlement of the controversy and the consequent termination of the defendants' strike warrant some substantial remittitur of fines, the district court will be free after our decision to consider and, within its discretion, to act favorably upon any such request.

The judgment of the trial court is affirmed.

HASTIE, Judge (concurring).

I join in the decision of the court but find it unnecessary to rule upon the constitutionality of the challenged regulation of the Cost of Living Council. The district court made no final ruling on this issue and settlement of the underlying labor dispute which had led to a controversial strike and a preliminary injunction against its continuance has now mooted all questions except the propriety of the contempt adjudication and the attendant imposition of heavy coercive fines.

With the outstanding issue thus limited, the action of the district court was clearly proper. When this case came on for hearing on motion for a preliminary injunction, a temporary restraining order was in effect and the defendants were on strike in open defiance of that order. The record, as it appeared at the conclusion of that hearing, established sufficient likelihood that the plaintiffs would ultimately prevail to justify preliminary injunctive relief. Moreover, since the defendants were even then in defiant violation of the restraining order and manifestly disposed to continue their contumacy, the court had compelling reason to adjudge them in contempt and to attempt to overcome their defiance by specifying and imposing heavy civil fines to be paid if the defendants should persist, as they did for several days, in their strike.