Marcel YOUAKIM, et al., Plaintiffs,

v.

Jess McDONALD, Director, Illinois Department of Children and Family Services,[1] Defendant.

No. 73 C 635.

United States District Court, N.D. Illinois, Eastern Division.

June 30, 1995.

---

1. Pursuant to Federal Rule of Civil Procedure 25(d), Jess McDonald, the Director of the Illinois Department of Children and Family Services, has been substituted as the Defendant in this suit for Jerome Miller, the Director of the Department of Children and Family Services at the time this suit was originally brought.

John Mark Bouman, Legal Assistance Foundation of Chicago, Chicago, IL, Kenneth Kandaras, John Marshall Law School, Chicago, IL, Stacey E. Platt, Legal Assistance Foundation of Chicago, Chicago, IL, Robert E. Lehrer, Diane L. Redleaf, Lehrer & Redleaf, Chicago, IL, for Marcel Youakim, Linda Youakim, Timothy Robertson.

Jonathan Clark Green, Illinois Attorney General's Office, Chicago, IL, for Jerome Miller.

Jonathan Clark Green, Illinois Attorney General's Office, Chicago, IL, Christina M. Tchen, Esther N. Iwerebon, Daniel Martin Feeney, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Illinois Department of Children and Family Services.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

On June 6, 1995, Governor Edgar signed P.A. 89–21, which was passed by the Illinois General Assembly on May 26, 1995. P.A. 89–21 includes statutory amendments autho-

rizing, directing and implementing the Illinois Department of Children and Family Service's ("DCFS's") Home of Relative Reform Plan ("HMR Reform"). Plaintiffs, a class comprised of related foster parents and related foster children claiming to be eligible for equal foster care payments and ancillary benefits pursuant to Title IV–E of the Social Security Act, claim that the transition process from the current foster care regime to HMR Reform violates the express provisions of the Judgment Order entered in this case on August 25, 1976, Title IV–E itself and the Due Process Clause of the Fourteenth Amendment. Plaintiffs have filed a Motion to Adjudicate Director McDonald in Civil Contempt of the 1976 Order and for Remedial Sanctions and a Supplemental Motion for relief pursuant to 28 U.S.C. §§ 2201, 2202.

In light of the July 1, 1995 effective date of the HMR Reform legislation, the Court has held itself and the parties to a demanding schedule in this adjudication. Because the Court believes that it is important to have a ruling in this case before the legislation goes into effect, the Court has not had the opportunity to produce a full Memorandum Opinion and Order, but seeks to articulate in as much written detail as possible the basis for the findings of fact and conclusions of law that underlie its decision.[2]

The Court has reviewed the motions submitted and the arguments of counsel, the exhibits received into evidence, all the testimony submitted to the Court in written and oral form, including written and oral direct, cross and re-direct examinations, detailed notes taken during the evidentiary hearing by the Court, the proposed findings of fact and conclusions of law submitted by the parties, the brief submitted by the amici curiae, the stipulations of fact submitted by the parties and a tape recording of the entire hearing. Where necessary, the Court made credibility determinations based on the witness' intelligence, ability and opportunity to observe, their memory and manner while testifying, any interest, bias or prejudice they may have had, and the reasonableness of their testimony in light of all the evidence presented in the case. The Court held an evidentiary hearing on June 15 and 16, 1995.

## BACKGROUND

Some explanation of the background of the case is required to understand the arguments of the parties.

Before the initial litigation in this case, many years ago, the State of Illinois defined the term "foster family home" as "a facility for child care in residences of families who receive no more than 8 children unrelated to them ... for the purpose of providing family care and training for the children on a full time basis." *Miller v. Youakim,* 440 U.S. 125, 130, 99 S.Ct. 957, 961, 59 L.Ed.2d 194 (1979). Thus, an individual providing family care and training to children related to the individual did not maintain a foster family home. Such children and caregivers were therefore ineligible for the federal foster care payments which were available through the states to foster family homes, even though a child would have been eligible for such payments if the child had been placed in the home of a non-relative. In 1976, a three-judge panel held that Illinois's practice of excluding relatives from the definition of foster family home conflicted with sections 601 and 608 of the Social Security Act and was therefore invalid under the Supremacy Clause of the United States Constitution. *Youakim v. Miller,* 431 F.Supp. 40, 45 (N.D.Ill.1976).

As part of its ruling, the Court entered a Judgment Order. The Order enjoined the State of Illinois from enforcing any law or administrative policy or procedure insofar as it excluded any child or foster care provider from eligibility in the Title IV–E[3] program

---

2. The parties and the Court have been fortunate to have outstanding counsel working on this case. The attorneys demonstrated zealous advocacy and extraordinary professional skill. The attorneys have prepared and presented in a remarkably short period of time a complete factual and legal presentation of their respective positions. The lawyers also demonstrated laudable cooperation, particularly in the production and presentation of the exceptional Stipulations of Uncontested Fact, which the Court has relied on in making many of its findings.

3. At the time of the Order, Title IV–E did not exist. Foster care payments were made pursuant to the Aid to Families with Dependent Chil-

or denied the full benefits available under that program on the basis of a familial relationship between the provider and the child. Judgment Order, ¶ 4(a). The Order also required that Illinois pay full Title IV–E benefits to related foster children and parents if they were eligible to receive them. The District Court's conclusion that the Illinois statute violated the Supremacy Clause was affirmed by the Seventh Circuit, 562 F.2d 483 (7th Cir.1977), and the Supreme Court, 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979), both with written opinions.

The instant litigation involves a dispute regarding the requirements of the 1976 Judgment Order. Plaintiffs claim that Defendant disfavors relative foster children and caregivers in the transition process between the old foster care system and HMR Reform. Plaintiffs contend that the transition process[4] established by the legislation violates the 1976 Order, the provisions of Title IV–E of the Social Security Act and the Due Process Clause of the Fourteenth Amendment. However, Plaintiffs do not challenge the authority of the State of Illinois to enact HMR Reform or any substantive portion of that legislation.

## STIPULATED FACTS

DCFS is the Illinois state agency charged with investigating allegations of child abuse and neglect throughout Illinois and caring for children and families who are the victims of child abuse and neglect.[5] If DCFS determines that a child is in imminent risk of harm or cannot be safely maintained with her family, DCFS may take immediate emergency custody of the child. Within two days of taking emergency protective custody, a hearing must be held in juvenile court to determine whether the child should be made a ward of the court and placed in DCFS guardianship. Children in the custody or guardianship of DCFS are placed in substitute care placements, including relative homes, non-relative homes, group homes, or institutions.

Children may be placed with relatives immediately by DCFS, even though the relative home is neither licensed nor approved as a foster home, as long as the relative home passes an initial "safety check." The Court will refer to this situation as placement in a "pre-approved" home.[6] In contrast, a child may be placed in a non-relative home only if that home has been licensed. Prior to HMR Reform, DCFS provided children placed in pre-approved homes the full foster care assistance of approximately $350 per child per month, despite the fact that the federal government did not reimburse Illinois under Title IV–E unless a related child was placed in a licensed or approved home. 42 U.S.C. § 672(c). Thus, from the point of view of the related foster care provider, there was no financial incentive to apply to be approved or licensed under the pre-HMR Reform foster care system. In addition, the difference between pre-approved, which means that the home is approved to take the child but not for reimbursement under federal programs, and approved, meaning that the State of Illinois was eligible to receive federal reimbursements under Title IV–E of the Social Security Act, was a distinction that understandably escaped related caregivers. The bottom line, however, is that many caregivers do not know whether or not they are "licensed" or "approved" as opposed to "pre-approved," a distinction which affects their rights in the transition to HMR Reform.[7]

Children in DCFS custody or guardianship are assigned a case worker, who may be a DCFS employee or may be assigned through a private child welfare agency, such as Catholic Charities. If a child's case is assigned to one of the sixty-seven private welfare agencies doing work for DCFS, the agency not only provides a caseworker to manage the

dren program. Accordingly, the 1976 Judgment Order refers to AFDC–F payments. These payments are the equivalent of those currently provided under Title IV–E.

4. For the purposes of this Opinion, the Court defines "transition process" as the period between the effective date of HMR Reform and the point in time at which all applications for licensure from currently unlicensed foster caregivers have been decided by DCFS.

5. This suit names Director McDonald in his official capacity only and is therefore merely a suit against DCFS itself. *See Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir.1991).

6. The procedures constituting the initial safety check are listed at 89 Ill.Admin.Code § 335.202.

7. *See, e.g.,* Grimes Direct, p. 9; Campbell Direct, p. 3; Crawford Direct, p. 3; Sumner Direct, p. 7.

case, but also is responsible for sheparding the family through the licensure or approval process.[8] As of April 30, 1995, 47,007 children were in foster care via DCFS placements. Private welfare agencies managed 31,596 of those children.

Prior to HMR Reform, foster children in Illinois who lived in private homes were categorized by the State in one of three groups. The children either lived in a licensed home, an approved home,[9] or a pre-approved home, with the pre-approved category being divided between those with applications for approval pending and those without. All children residing with non-relatives must live in licensed homes, as an unrelated foster parent could not, and can not under HMR Reform, care for a child unless the foster home has been licensed. The "approved" category was created in 1986, in part to make it easier for DCFS to place children in relative homes. As the Court has noted, DCFS may place children in the home of a related person immediately after the child is removed from her original home so long as the relative satisfies an initial safety check. Relatives may then apply to have their homes approved or licensed.

A summary of the status of the 26,368 children in DCFS custody residing in relative homes as of April 30, 1995 (of the total of 47,007 children involved with DCFS) is presented here.

| | Approved or Licensed | Pending | No Application | Denied | Total |
|---|---|---|---|---|---|
| DCFS | 2,027 | 1,086 | 5,402 | 11 | 8,526 |
| Private Agency | 9,507 | 4,766 | 3,544 | 25 | 17,842 |
| Total | 11,534 | 5,852 | 8,946 | 36 | 26,368 |

Of the 11,534 children in the "Approved or Licensed" category, only 308 are in licensed homes. DCFS receives federal Title IV–E funds only for those children in licensed and approved homes, although DCFS has continued to pay the full foster care rate of approximately $350 per child per month to children in the "Pending" and "No Application" categories without federal assistance.

The statistics with respect to the number of relative foster care homes in each category as of April 30, 1995 are similar to those with respect to the number of children, as demonstrated by this table.

| | Approved or Licensed | Pending | No Application | Denied | Total |
|---|---|---|---|---|---|
| DCFS | 1,051 | 681 | 3,182 | 7 | 4,921 |
| Private Agency | 4,005 | 2,935 | 1,994 | 10 | 8,944 |
| Total | 5,056 | 3,616 | 5,176 | 17 | 13,865 |

**8.** Some private welfare agencies are "approval only," meaning that DCFS has not granted them the authority to participate in the licensing process at all. Foster caregivers assigned to those agencies therefore had virtually no opportunity to be licensed.

**9.** The State of Illinois established the "approved" category in 1986 with the promulgation of 89 Illinois Administrative Rule 335. Rule 335 provides that the approval standards:

> are substantially the same with regard to the safety, health and welfare of children as those promulgated for licensure of unrelated foster family homes pursuant to the Child Care Act of 1969.

89 Ill.Admin.Rule 335.102. Rule 335 was abolished by the HMR Reform.

Of the homes that were Approved or Licensed, only 182 were licensed. From both tables presented, it is apparent that the private agencies have done a substantially better job approving and licensing homes than DCFS (44.8% of private agency homes approved or licensed; 21.4% of DCFS homes), despite the stated DCFS policy to actively pursue approval or licensure.

Prior to HMR Reform, relatives were favored by DCFS for foster child placements. DCFS actively recruited relatives as foster care providers. In 1986, DCFS created the "approved" category, in part to make it easier for DCFS to place foster children with relative caregivers. Between the promulgation of 89 Ill.Admin.Code § 335 (establishing the approval category) and HMR Reform, DCFS's preference for relative caregivers was consistent with State law. *See* 20 ILCS 505/7(b) (repealed by HMR Reform). Furthermore, to the extent DCFS encouraged relative caregivers to apply to be approved or licensed, DCFS usually encouraged the approval process, which was easier for both DCFS and the family involved.

DCFS has struggled to carry out its responsibilities to the people of Illinois, due in large part to the enormity of those responsibilities. The number of children in DCFS custody has nearly doubled in the last four years, rising from 23,700 in June, 1991 to 47,000 as of April 30, 1995. Similarly, the number of children in state custody who are placed with relative care givers increased from approximately 5,500 in June, 1988 to over 25,700 in January, 1995, an increase of 367%. According to DCFS, this astronomical growth in relative care was primarily caused by a state law which established a preference for relative caregivers (and was repealed as part of HMR Reform), a broad definition of "neglected children" which included children living with relatives in the absence of a biological parent, slower rates of discharge from relative homes and the disparity between the payments available to

foster parents caring for relatives and those available to non-foster parent caregivers who relied solely on other kinds of public assistance, including Aid to Families with Dependent Children ("AFDC"). In addition, the growth in relative foster care is partially due to the fact that DCFS sought out or solicited relative caregivers.

The cost of maintaining DCFS is high, particularly because Illinois provides the full foster care rate of payment to foster children even in cases where the federal government does not partially reimburse the State for doing so, such as in cases where a relative cares for a child but does not maintain an approved or licensed home. Hawaii is the only other state that pays foster care rates regardless of the eligibility for Title IV–E reimbursements. DCFS estimates that the State of Illinois lost $16 million in federal funds in fiscal year 1992 due to its policies regarding relative foster care payments. As the Court has noted, much of this loss was caused by the State's inability to license or approve, and therefore qualify for Title IV–E reimbursements, many of the relative foster homes. Part of this problem is due to the fact that relative caregivers lack a financial incentive to pursue licensure or approval in the pre-HMR Reform system as their benefit remains constant regardless of their status. Part of the problem also lies with administrative difficulties at DCFS. For example, DCFS and the private agencies responsible for licensing and approval of relative foster homes have lost applications filed by some foster parents. DCFS claims to have introduced steps to increase its administrative efficiency, such as the introduction of new fingerprint reading equipment which will supposedly reduce the time it takes to consider an application for licensure, but no evidence indicating any measurable improvements was submitted to the Court.

The HMR Reform at issue in this litigation is a response to these, and other, problems. Governor Edgar first announced HMR Re-

form on March 1, 1995. For the purposes of this litigation, three main components of HMR Reform are critical. First, HMR Reform eliminates the "approval" category for foster family homes. Second, Illinois will no longer pay the foster care rate to homes with applications pending. Therefore, under HMR Reform, which is effective July 1, 1995, foster children will receive foster care payments from DCFS only if they are placed in a foster family home that is licensed under the terms of the Illinois Child Care Act of 1969.[10] Third, DCFS will not provide an administrative appeal to those applicants for licensure who are rejected.

After July 1, 1995, the licensing requirements under HMR Reform are the same for relative and non-relative caregivers and slightly more stringent than those in place prior to HMR Reform. Furthermore, HMR Reform changes the prior "official" policy of requiring foster care providers to apply for approval or licensure as a condition to keeping a child.[11] Under HMR Reform, the caregiver has the option to pursue a license or not. Therefore, a caregiver who is not capable of becoming licensed may still have a child placed in his or her foster home, but the caregiver will not receive foster care payments.

Those homes that are already licensed will not have to re-apply until their current licenses expire, despite the changes in the substantive licensing requirements. Those homes that are not yet licensed, however, which are mostly relative homes, must apply for and obtain a license to preserve their foster care payments beyond September 30, 1995, or in many cases, beyond July 1, 1995. For those foster children and foster care providers who will lose foster care payments as of July 1 or September 30 due to the

implementation of HMR Reform, the amount of the loss will depend on the number of foster children involved. Although foster care payments will be eliminated for all but licensed homes, the State will continue to provide assistance to unlicensed homes via the Department of Public Aid and the Aid to Families with Dependent Children programs. Because these programs utilize an "economy of scale" theory, the payments increase at a decreasing rate for each additional child involved. For example, for a single foster child in Cook County, an unlicensed relative caregiver will receive $252 per month, or 72% of the approximately $350 per month they had received as a foster parent. An unlicensed foster home with eight children (the statutory maximum) would receive $1,165 per month, or 42% of the approximately $2,800 it would have received in the foster care program.[12] Of course, a relative caregiver may receive the full foster care benefits upon receiving a license as a foster care provider. The foster care payments do not incorporate economies of scale because obtaining and maintaining a license entails significant fixed costs, including maintaining certain housing standards. According to DCFS, the additional requirements placed on licensed foster homes, including having a telephone, a satisfactory water supply, and undergoing foster care training as well as a criminal check, justify the additional payments made to licensed caregivers as opposed to those who have merely passed the safety check.

DCFS began the implementation of HMR Reform by holding briefings for agencies and advocates in March, 1995. In April, 1995, DCFS provided current relative caregivers with initial written notice of the HMR Reform Plan. On April 28, 1995, DCFS issued

10. There is one exception. Relative caregivers who, as of July 1, 1995, are approved under the prior approval rules at 89 Ill.Admin.Code § 335 and have submitted an application for licensure postmarked on or before June 30, 1995, will continue to receive foster care payments until DCFS makes a decision on their application or September 30, 1995, whichever comes first.

11. In light of the fact that the percentage of relative homes that became approved never exceeded 66%, it is clear that this policy was rarely, if ever, enforced.

12. Payments made to unlicensed caregivers will be made at a level to insure that foster children in unlicensed homes receive 100% of the Department of Public Aid's "Standard of Need," which is periodically calculated. It is important to note that to reach 100% of the Standard of Need, DCFS will supplement the payments made under the AFDC program, as many children who participate solely in AFDC do not receive 100% of the Standard of Need.

a second notice of HMR Reform, including an application for licensure in notices sent to approved homes and homes with applications for approval pending. On approximately June 12, 1995, DCFS issued another notice to relative caregivers. This time, however, separate notices were sent depending upon whether the home was approved, pre-approved with an application pending, or pre-approved without a pending application.[13] These three notices were the only notice of HMR Reform sent to relative caregivers. Applications for licensure were not sent to pre-approved caregivers who did not have an application for approval pending. These caregivers were instructed to obtain applications from their case worker.

Many applications for licensure filed by relative caregivers before July 1, 1995 will not be decided by September 30, 1995. As a result, many foster caregivers will lose full foster care benefits at that time. Under HMR Reform, some of those applicants, as well as some of those who lost benefits as of July 1, 1995, will lose benefits even though they satisfy the licensure requirements under HMR Reform. In such cases, DCFS will not pay benefits retroactively.

DCFS intends to notify applicants for licensure of its decision with respect to their application by mail. If an application is rejected, the notice will include a written reason for the rejection. Under HMR Reform, there is no right to an appeal of an unfavorable decision. Appeals are available in only two situations: (1) to those homes that lose benefits and claim that the loss is the result of a DCFS mistake related to whether or not the home is already licensed; and (2) to those approved homes who lose benefits and claim that the loss is the result of a DCFS mistake related to whether an application for licensure was made in time (by June 30, 1995) to preserve benefits until September 30

or until a determination by DCFS, whichever occurs earlier.

The financial implications of HMR Reform are significant. DCFS estimates that HMR Reform will result in a net savings to the State of Illinois (and net loss to benefit recipients) of $44.4 million, consisting of $60.8 million in savings at DCFS offset by $16.4 million in increased cost to the Department of Public Aid.

## ADDITIONAL FINDINGS OF FACT

In light of the nearly comprehensive nature of the factual stipulations submitted by the parties, the Court needs to make only these additional findings of fact.

First, the Court finds that prior to HMR Reform, the licensing process was not equally available to both relative and non-relative foster homes. This conclusion is supported by DCFS's admission that nine of the sixty-seven private agencies have been authorized to conduct approval only studies. Def.'s Resp. to Pl.'s Inter., p. 10. For the foster homes approved by these agencies, no opportunity for licensure was ever presented. Furthermore, because both licensed and approved homes received full foster care benefits, and because approval was less intrusive and had fewer requirements than licensing, approval was easier for both the foster care family and DCFS staff or the private agency assigned to that family. Morsch Direct, p. 10 ("consistent with the *Reid* Consent Decree and [DCFS] practice, nearly all relatives were processed through the approval, rather than the licensing, process"). This finding of fact is supported by the statistical evidence. As of April 30, 1995, only 1.2% of all related children in foster care resided in licensed homes, while 42.6% of such children lived in approved homes. In addition, 22.2% of the pre-approved homes had applications for ap-

---

**13.** It is unclear from the stipulations filed by the parties how DCFS determined whether an application was pending. The stipulation indicates that which notice was sent depended upon whether DCFS "considered" an application to be pending.

One of the elements of HMR Reform is the establishment of a definition of "pending." Previously, no official definition existed, but DCFS considered an application "pending" solely upon the submission of a written application form. Under HMR Reform, DCFS will not consider an application for licensure to be pending until certain items are submitted. In light of this new definition, the Court cannot determine whether notices were sent pursuant to the pre-HMR Reform policy, the HMR Reform definition, or some other determination of pending used exclusively for this purpose.

proval pending. With respect to number of homes, the evidence is similar. As of April 30, 1995, 1.3% of all homes with related children were licensed while 35.2% were approved. Homes with pending applications for approval accounted for 26.1% of the total number of homes with related children.

Second, the Court finds that DCFS will be unable to render decisions on the applications for licensure that will be pending on July 1, 1995 in time to prevent the deprivation of benefits to many applicants who satisfy the requirements for licensure. On the record before it, the Court is unable to reasonably estimate the time DCFS will need to render decisions on the applications for licensure that will be filed by relative approved caregivers as a result of HMR Reform. Plaintiff's expert, Mary Grimes, testified that it takes approximately six months to complete the licensure process. DCFS has a policy that a decision to issue a license on an application should be made within seventy-five days of the time the application is filed. However, DCFS statistics indicate that only 19.3% of all licensing applications in Cook County in fiscal 1994 were licensed within seventy-five days. Pl.'s Ex. 6 at T316. In private agencies in Cook County during the same time period, 36.8% of the licensure applications were determined within seventy-five days. Pl.'s Ex. 6 at T384. Plaintiffs' witnesses testified to long time periods and various difficulties involved in processing applications. *See* Grimes Direct, pp. 7, 9, 20, 22–23, 25; Grimes Supp. Direct, p. 2; Stidhum Direct, p. 3; Sumner Direct, p. 6–7; Tate Direct, p. 4; Walton Direct, p. 4. The substantive requirements for licensure have not been diminished by HMR Reform. Defendant submits evidence that the process has been streamlined and benefits from new technologies since the statistics provided above were developed. However, Defendant has not produced any evidence of any actual improvements in the time it takes, on average, to process an application for a license. Plaintiffs' witnesses testified to problems in obtaining licensure applications and counseling from caseworkers. Under the new HMR Reform rules, an applicant must receive six hours of foster care training, further delaying the application process. Accordingly, the Court concludes that the average period to process a completed licensure application will be in excess of ninety days.

Third, some of the relative foster children and care providers who are currently receiving full foster care benefits as approved homes or because they have applications for approval pending will lose those benefits under HMR Reform transition schedule despite the fact that they currently meet the requirements for licensure and will eventually be licensed. This conclusion is based in large part on the definition of "approved" in 42 U.S.C. § 672(c), which defines "foster family home" as:

> a foster family home which "is licensed by the State in which it is situated or has been approved, by the agency of the State having responsibility for licensing homes of this type, as meeting the standards established for such licensing."

This definition, under which the State of Illinois created the approved category in 1986, indicates that a home must meet licensure standards to be approved. Furthermore, because DCFS and the private agencies providing services to foster children and caregivers have channelled foster homes towards the approved category rather than the licensed category, the Court concludes that it is a certainty that many approved homes meet the standards for licensure.

Fourth, a substantial number of relative foster care homes that are only pre-approved will lose full foster care benefits under the HMR Reform transition schedule despite the fact that they currently meet or are able to meet the requirements for licensure and will eventually be licensed. Fifth, no non-related foster care children and caregivers who are currently receiving full foster care benefits will lose those benefits under the HMR Reform transition schedule.

## ANALYSIS

Plaintiffs argue that the transition from the pre-HMR Reform system of providing public assistance to relative foster children and relative foster caregivers violates the Judgment Order entered in 1976 in this case, Title IV–E of the Social Security Act and the

Due Process Clause of the Fourteenth Amendment. The Court will consider each argument in turn.

## I. The Judgment Order

■ As a result of the District Court's conclusion, in 1976, that Illinois' statutory definition of "foster family home," which excluded relative caregivers, was in conflict with the provisions of the federal Social Security Act, a Judgment Order was entered to provide the Plaintiffs and members of the Plaintiff class full and equitable relief. Plaintiffs now claim that HMR Reform violates that Judgment Order. For the purpose of this litigation, the operative paragraph of the Judgment Order is paragraph 4, which provides, in part:

> Defendants, their agents, employees and all other persons in active concert with them are enjoined from:
>
> (a) enforcing [Illinois law] and all implementing administrative policies and procedures, insofar as they exclude from eligibility, or deny full [Title IV–E] payments or ancillary benefits to, foster children living in foster homes maintained by related foster parents, and to these related foster parents, when such children and such parents are otherwise eligible for such payments and benefits;
>
> (b) failing to pay full [Title IV–E] payments to foster children living in foster homes maintained by related foster parents, and to these related foster parents, when such children and parents are otherwise eligible for such payments.

Judgment Order, ¶ 4. Plaintiffs argue that HMR Reform Plan consists of Illinois law and administrative policies and procedures that exclude relative foster children from Title IV–E benefits and deny such benefits to them on account of their relationship to their foster caregiver. Plaintiffs further argue that the Supreme Court decision in *Youakim*

bolsters the conclusion that the State may not treat foster children differently on account of a family relationship with the foster care provider. The Supreme Court wrote, "Congress intended no distinction between related and unrelated foster homes." *Youakim*, 440 U.S. at 135, 99 S.Ct. at 964. Therefore, the State of Illinois was precluded from establishing a more narrow entitlement to benefits than Congress had created. *Id.*

Defendant acknowledges that it may not distinguish between relative and non-relative foster care homes when providing benefits pursuant to a federal program. Defendant argues, however, that it is merely distinguishing between licensed homes and unlicensed homes, a line that it is unquestionably permitted to draw. Defendant argues that the language of the Judgment Order prohibits disparate treatment of related and non-related foster children only to the extent they are "otherwise eligible for benefits." Because the State has the power to determine the eligibility criteria, Defendant argues that treating non-licensed foster homes differently than licensed foster homes is permissible under the Judgment Order. Defendant also points out that relative caregivers may apply for a license subject to the same requirements as non-relatives.

Although federal law does provide that "approved" or "licensed" homes are eligible for Title IV–E benefits, 42 U.S.C. § 672(c), witnesses for both sides testified that federal law does not require the establishment or maintenance of a category of "approved" foster homes. Thus, the State may elect not to "approve" any more foster homes without running afoul of the Judgment Order.

The situation here, however, is more complicated. In the pre-HMR Reform system, the State of Illinois created a distinction without a difference in that the distinction between a licensed home, an approved home, and a pre-approved home made no difference to the amount of funds or services a relative foster home could obtain.[14] Partially because this distinction made no difference to the

---

**14.** The Court acknowledges that the distinction between licensed or approved and pre-approved was important to the State in that federal reimbursements were available only for licensed and approved homes. The caregiver and the child, however, undoubtedly did not know of this distinction, and in any event the distinction was meaningless as they still received full foster care benefits.

funds received by the foster children and caregivers, DCFS field staff and private agency case workers advised and channelled relative caregivers towards the approval category rather than licensure. Approved homes have enjoyed full foster care benefits ever since. Essentially, DCFS, through HMR Reform, retroactively renders the distinction between licensure and approval, which was previously solely a matter of form, a matter of critical substantive importance. By doing so, DCFS is deliberately disfavoring relative caregivers.

Under HMR Reform, the relative caregivers are placed in an impossible situation through the actions of DCFS. They no longer qualify for benefits due to their approved status and there is simply no way that DCFS will be able to process all the applications for licensure in time to prevent the loss of substantial foster care benefits to these homes. Because they face a loss of foster care benefits which they are powerless to prevent, relative caregivers are disfavored when compared to non-relatives under HMR Reform. Non-relatives, who were not subject to DCFS's channelling practice, do not face this difficulty. To the contrary, they were required to be licensed from the start. Both relative and non-relative caregivers will remain responsible for the care of the children placed in their homes, although the relative caregivers will be expected to provide this same care at a lower rate of compensation.[15] To the extent DCFS argues that the dilemma is caused by the relatives failure to obtain a license, DCFS has caused that state of affairs. Because DCFS is required by the Judgment Order to refrain from discriminating against relative foster children and caregivers on the basis of the familial relationships between them, DCFS has a concomitant duty to insure that HMR Reform does not create disparate treatment of relative foster children based on prior policies and practices of DCFS itself.

The Court concludes that the combination of the DCFS practice of channelling relative caregivers into the approved (or pre-approved), rather than licensed, status and the elements of HMR Reform which place critical importance on the possession of a license disfavor relative caregivers irrespective of their eligibility for full foster care benefits. The Court further concludes that the State of Illinois and DCFS have not taken any action to mitigate the discriminatory effect HMR Reform will have on relative children and caregivers. Accordingly, relief is appropriate under the Judgment Order.

■ Although the Court finds that HMR Reform violates the Judgment Order entered in this case, it does not find the Director in civil contempt. The standard for civil contempt in the Seventh Circuit is high. In *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455 (7th Cir.1993), the court explained that a party may be held in contempt only for behavior which is clearly prohibited by a court order "within its four corners." *Id.* at 460 (quoting *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 237, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975)). The violation of the Judgment Order in this case arises over a period of years from the combination of prior DCFS practices and the HMR Reform legislation, neither of which independently violated the Judgment Order. As a result, the Court is unwilling to find the Director in contempt for the result of independent actions by his department and the State of Illinois. This is not to say that the Court should not grant relief to Plaintiffs. Paragraph 12 of the Judgment Order states, "This Court shall retain continuing jurisdiction over this action." Judgment Order, ¶ 12. Thus, the Court still has the authority to enforce the Judgment Order to prevent this discrimination. The Court will discuss the appropriate relief to which Plaintiffs are entitled later in this opinion.

---

**15.** This aspect of HMR Reform raises fundamental issues of fairness as well as issues of disparate treatment. DCFS contends that the rate of foster care payments is set partially to compensate foster care providers for the fixed costs of meeting the licensure requirements. For those relatives who received full benefits as approved homes and have applied for licenses in response to HMR Reform, full foster care payments will be denied them while DCFS processes their application. During this period, the family will be required to continue to incur the fixed costs of maintaining a licensed facility in order to keep their application valid, even though the higher foster care payment will not be available to defray these costs.

## II. TITLE IV–E

Plaintiffs argue that the transition process violates Title IV–E of the Social Security Act and its implementing regulations. Plaintiffs argue that, because Title IV–E allows full foster care payments to homes that are either "licensed" or "approved," the State may not disfavor those homes which are approved rather than licensed. Plaintiffs contend that DCFS has created a disparate burden on relative foster homes by eliminating the approval category, thereby automatically depriving the vast majority of relative caregivers of Title IV–E funds. As the Court has already explained in its discussion of the Judgment Order, DCFS has treated relative caregivers less favorably than non-relative caregivers by channelling relative caregivers towards the approved category and then eliminating it. Full relief arising from this disparate treatment is available as a result of the Court's conclusion that HMR Reform violates the Judgment Order.

To the extent Plaintiffs object to provisions of HMR Reform other than the transition process under Title IV–E, including the right of appeal from unfavorable licensing decisions, the Court considers those arguments to attack the substance of HMR Reform. The issues before the Court in this litigation are whether the transition process itself is unlawful. The Court issues no opinion with respect to the other provisions of HMR Reform. Specifically, the Court has not had sufficient briefing of Plaintiffs' argument regarding the availability of appeals from the denial of licenses under HMR Reform, in which they rely on a letter dated June 15, 1995 from Kay Willmoth, the Assistant Regional Administrator for Family Security for the Department of Health and Human Services. Willmoth states that "it is our view" that children living in homes that are pre-approved are entitled to hearings under section 671(a)(12) regarding the substance of the licensure decision as well as to determine whether their foster parents' application for licensure have been processed with reasonable promptness. Additionally, Willmoth states that children living in approved homes are entitled to the aforementioned hearings as well as the continuation of benefits while their licensure application is pending. In light of the date of Willmoth's letter, the parties have not had a complete opportunity to present argument on this point. Accordingly, the Court does not feel that it has enough information to rule on this issue.

The Court expressly limits the scope of its opinion in this matter to the legality of the transition process. Specifically, the Court limits its analysis to the questions of whether the transition process treats relative caregivers the same as non-relatives and whether the procedures by which the State intends to deprive relative caregivers of foster care benefits are constitutionally adequate.

## III. DUE PROCESS

■ Plaintiffs argue that the transition from the pre-HMR Reform system to the HMR Reform systems deprives them of property without due process of law. Plaintiffs contend that they have a property interest in the foster care payments which they received prior to HMR Reform. Additionally, they claim that the State may not deprive them of those benefits without granting them the opportunity to establish that they will qualify for the same benefits under the new HMR Reform program. Defendant argues that Plaintiffs were granted all the process they are entitled to by the passage of P.A. 89–21 by the Illinois General Assembly.

■ The Due Process Clause of the Fourteenth Amendment provides that no State shall deprive any person of property without due process of law. U.S. Const. amend. XIV. Therefore, in cases asserting the unlawful deprivation of property, the Court must complete a two-part inquiry. First, was the claimant deprived of a protected property interest and, if so, what process was his due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982).

■ Foster care benefits, like the food stamp benefits at issue in *Atkins v. Parker*, 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985) and the welfare benefits at issue in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), "are a matter of statutory entitlement for persons qualified to

receive them." *Goldberg,* 397 U.S. at 262–63, 90 S.Ct. at 1017–18. Such entitlements are property which is protected by the Due Process Clause. *Id.* Accordingly, the procedures that are employed in determining whether an individual may continue to participate in the statutory program must comply with the commands of the Constitution. *Atkins,* 472 U.S. at 128, 105 S.Ct. at 2528 (citing *Goldberg,* 397 U.S. at 262–63, 90 S.Ct. at 1017–18). Neither party contests that the benefits themselves are constitutionally protected property.[16]

■ Defendant asserts, citing *Atkins,* that the Illinois legislature provided all the process that was due for a change in the scope of the foster care public assistance in Illinois. It is undisputed that a legislature may reduce in mass the benefit levels provided to a welfare recipient without violating the Due Process Clause. *Logan,* 455 U.S. at 432–33, 102 S.Ct. at 1155–56 (citing cases). In such cases, the legislative determination provides all the process that is due. *Id.* at 433, 102 S.Ct. at 1156. In *Atkins* itself the Supreme Court considered whether recipients of public assistance had a constitutional right to process before an amendment reducing the level of their benefits could be implemented. Congress had increased the percentage of an applicant's income that would be considered by the Department of Agriculture when calculating the amount of food stamp assistance to which the applicant was entitled. *Atkins,* 472 U.S. at 117–18, 105 S.Ct. at 2522–23. Plaintiffs argued that they had a constitutional right, pursuant to the Due Process Clause, to advance notice of the effect the statutory amendment would have on them. The Court immediately noted that *Atkins* involved a legislatively mandated substantive change in the scope of an entire program, not individual eligibility determinations. *Id.* at 129, 105 S.Ct. at 2528–29. As such, the Court noted that the Due Process Clause imposes no substantive limit on Congress's authority to make substantive changes in the law of public benefits. *Id.* (citing *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971)). The Court then held that legislative process provided all the process to which the plaintiffs were entitled. *Atkins,* 472 U.S. at 129–30, 105 S.Ct. at 2529 ("A welfare recipient is not deprived of due process when the legislature adjusts benefit levels.... The legislative determination provides all the process that is due.").

Defendant argues that this case is on all fours with *Atkins,* contending that HMR Reform is a mass change in the scope of foster care assistance in Illinois. From this, Defendant argues that the process provided by the Illinois General Assembly in debating and eventually passing HMR Reform provides all the process that is demanded by the Constitution. HMR Reform, however, is not merely a mass change in the scope of the foster care program. For many current recipients of full foster care benefits, HMR Reform is

16. Defendant argues that Plaintiff has no constitutionally protected interest in a transition period or in a "reasonable eligibility process" because an interest in process alone is not protected by the Fourteenth Amendment. It is true that the Due Process Clause does not recognize an interest in process as property. *Doe v. Milwaukee County,* 903 F.2d 499, 502–03 (7th Cir.1990). However, contrary to Defendant's argument, Plaintiffs do assert a protected property interest here. Plaintiffs argue that they have an interest in the continuation of the foster care payments that were being made to them under the prior system until they have a fair and reasonable opportunity to apply for these same benefits under HMR Reform. Plaintiffs claim an interest in the dollars they were receiving prior to HMR Reform and in the continuation of those benefits under HMR Reform. Welfare benefits are property for the purpose of the Fourteenth Amendment. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The foster care payments here are indistinguishable from the welfare benefits in *Goldberg* for the purpose of this analysis.

Defendant suggests that Plaintiffs have not been deprived of their interest in the foster care payments because they can apply for a license and, if successful, obtain full foster care benefits. However, as the Supreme Court made clear in *Logan,* "[w]hile the legislature may elect not to confer a property interest, ... it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Logan,* 455 U.S. at 432, 102 S.Ct. at 1156 (quoting *Vitek v. Jones,* 445 U.S. 480, 490–91 n. 6, 100 S.Ct. 1254, 1263 n. 6, 63 L.Ed.2d 552 (1980)). Thus, Defendant cannot rely on the fact that it is now treating the Plaintiffs just like new applicants for a foster care license. Having created a property interest, Defendant has taken on the obligation of procedural fairness if he seeks to deprive the Plaintiffs of it.

also a determination of their continuing ability to receive benefits. HMR Reform cuts off benefits to all those relative foster children and caregivers who had previously received benefits as a result of their approved status until DCFS renders a decision on their application for licensure. Therefore, unlike *Atkins*, where the benefit levels were reduced across the board, the benefit levels involved here may or may not be changed by HMR Reform. HMR Reform, then, does not affect all participants in the pre-HMR Reform system, who are accordingly "property" holders, in the same manner. To the contrary, it discriminates against relative foster children and caregivers during this transition process.

HMR Reform does, in part, effectuate a mass change in the foster care program in Illinois. That portion of HMR Reform which represents a mass change, however, is not challenged by Plaintiffs in this litigation. Plaintiffs repeatedly disavow any attempt to challenge the State's ability to change the substance of the foster care program in the manner conceived in HMR Reform. The HMR Reform may clearly go forward with respect to individuals who have not yet entered the system or who maintain licensed foster homes. Furthermore, DCFS may immediately implement the portions of HMR Reform which change various substantive components of foster care, including the definition of neglect, the elimination of the "approved" category and many others, as long as those standards are applied equally to relative and non-relative caregivers.

The only part of HMR Reform that Plaintiffs do challenge is the elimination of benefits to relative foster children and relative caregivers who qualified under the previous system but do not have an opportunity to qualify under the new system because DCFS has not provided a mechanism by which it can make that determination before the change in benefit payments is scheduled to take place. Accordingly, this case falls into the caveat in *Atkins* involving individual eligibility determinations, as HMR Reform essentially deprives relative foster care families of continuing full foster care payments.

 Having determined that *Atkins* does not apply to the dispute raised in this litiga-

tion, the Court must still determine whether Plaintiffs received the process to which they are entitled. Plaintiffs contend that the instant case is analogous to *Logan*, in which the Supreme Court held that, although a state may reduce or terminate state created property interests generally, it cannot create procedural barriers to a property holder's ability to assert his rights. *Logan*, 455 U.S. at 433–34, 102 S.Ct. at 1156–57. In *Logan*, the plaintiff alleged unlawful employment discrimination before an administrative Commission, as he was required to do under the state scheme. *Id.* at 426, 102 S.Ct. at 1152–53. The Commission was obliged, by statute, to act on his charge within 120 days. *Id.* The Commission inadvertently failed to do so. *Id.* The case eventually reached the Illinois Supreme Court, which held that the Commission's failure to investigate plaintiff's charge within the required time period destroyed his cause of action, even though the Commission's failure to act was entirely out of plaintiff's control. *Id.* at 427, 102 S.Ct. at 1153. The Illinois Supreme Court held that no Due Process issue was presented because the Illinois legislature had provided all the process that was required when it passed the 120 day requirement. *Id.*

The Supreme Court of the United States unanimously reversed, holding that the Fourteenth Amendment requires an opportunity, granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case. *Id.* at 437, 102 S.Ct. at 1158–59. Because the plaintiff's cause of action, his property, was deprived in a random manner, without granting him an opportunity to present the merits, due process was lacking. Plaintiffs argue that HMR Reform does exactly that to their property, randomly destroying it without any regard to the merits of their claim for continued benefits.

 As *Logan* establishes, procedures or systems that govern the administration of public aid programs must be fair and rational. States cannot create systems which arbitrarily deprive persons of property. In *Carey v. Quern*, 588 F.2d 230 (7th Cir.1978), the Seventh Circuit wrote:

In the context of eligibility for welfare assistance, due process requires at least that the assistance program be administered in such a way as to insure fairness and to avoid the risk of arbitrary decision making.

*Id.* at 232. In order to insure fairness, a party deprived of property by a change in the rules governing a government program must have a reasonable *opportunity* to present his case and have the merits fairly judged under the new rules. *See Logan,* 455 U.S. at 433, 102 S.Ct. at 1156. A state simply may not set up a system in which benefits are available to a class of persons, but it is impossible for any single person to demonstrate that they are entitled to continued benefits.

By providing that Plaintiffs' entitlement to full foster care benefits ends as of a particular date (either July 1, 1995 or September 30, 1995) unless DCFS acts on Plaintiffs' applications by that date (an event which the Court has found is very unlikely for most Plaintiffs), HMR Reform deprives Plaintiffs of their property interests in continuing foster care benefits without the benefit of due process. The deadline date, on which Plaintiffs' property interest is destroyed is analogous to the 120 day deadline in *Logan.* Neither Plaintiffs here nor the plaintiff in *Logan* had any ability to expedite the process, their property interest was entirely in the hands of the State and the State is proceeding arbitrarily. Moreover, HMR Reform also establishes that no retroactive benefits will be paid, even where DCFS determines that the applicant was in continual compliance with the licensure requirements from the July 1 effective date. Thus no post-deprivation process is available either. In light of DCFS's practice of channelling related foster caregivers into the approved category rather than the licensed category, irrespective of their ability to qualify for a license, this system is arbitrary and unfair.

Just as the plaintiff in *Logan* was entitled to notice and a fair hearing before he was deprived of his property in the form of a cause of action, Plaintiffs here demand notice and a right to a fair consideration of their applications for continued benefits.[17] The Court agrees that the components of HMR Reform that deprive Plaintiffs of continued foster care payments without a fair adjudication of their claim of entitlement is unconstitutional.

## IV. RELIEF

 Having held that the transition period established by HMR Reform violates both the Judgment Order and the Due Process Clause of the Fourteenth Amendment, the Court must determine what relief is appropriate. The Court has the authority to grant relief necessary to modify and enforce the Judgment Order as a result of its continuing jurisdiction over that Order and as a result of the violation of the Due Process Clause pursuant to 28 U.S.C. §§ 2201, 2202. The Court's goal in fashioning this relief is to provide, consistent with the Fourteenth Amendment, "an opportunity granted at a meaningful time and in a meaningful manner, for a hearing appropriate to the nature of the case." *Logan,* 455 U.S. at 437, 102 S.Ct. at 1159.

In the Court's opinion, the denial of due process can be remedied by allowing all relative foster caregivers, who received foster care benefits prior to HMR Reform, an opportunity to have their application for licensure determined on its merits before their benefits can be reduced. This relief would rectify the adverse disparity between relative and non-relative caregivers so that the relative caregivers, without being penalized for DCFS's prior practice of channelling non-relatives into a different category than relatives, would be granted or denied a license based on the same requirements as the non-relatives face. In addition, the opportunity for hearings on the merits of Plaintiffs' applications, assuming that the hearings are preceded by sufficient notice, will satisfy the requirements of the Due Process Clause.

As adequate notice lies at the heart of due process, *Cosby v. Ward,* 843 F.2d 967, 982

---

**17.** It is important to recognize that Plaintiffs' applications for licensure are applications for a continuation of the benefits they have been re-ceiving as long as they have been involved with DCFS.

(7th Cir.1988), the Court will require that another notice be sent to all unlicensed relative foster homes via first class mail. The notice should include an application for a foster care license [18] and an explanation of how to contact a DCFS field staff member or private agency case worker as well as the DCFS Ombuds' tollfree hotline for assistance.

In order that relative foster caregivers have a reasonable time to prepare and file the application, the Court has determined that the deadline be 35 days from the date of mailing the notice and application. The Court requires that a caseworker be available to answer questions for caregivers who have questions. Furthermore, the Court requires that DCFS continue to provide the assistance of the Ombuds, mentioned in paragraph 80 of Defendant's Proposed Findings. If a relative caregiver fails to comply with the deadline for application, benefits may be reduced as envisioned in HMR Reform. If the applicant meets the deadline, benefits must continue at the full foster care rate until DCFS processes the application and renders a decision. If the application is denied, DCFS must clearly state the reasons for the denial. Of course, the licensure applications must be judged on the same basis as licensure applications received from non-relative caregivers in order to comply with the 1976 Judgment Order.

This relief places appropriate incentives on both the applicants and DCFS. The applicants are required to quickly comply with the portion of the licensing procedure that is within their control as they must submit an application for licensure within a reasonable specified time of delivery of the final notice. The applicants will not, however, be in jeopardy of losing their benefits based on DCFS's inability to process applications promptly. DCFS will be able to reduce the financial burden on itself by quickly determining which licensing applications are granted and which are denied. The Court believes that these incentives are far more sensible than those created by the HMR Reform transition, where applicants were helpless to speed their application along and DCFS could save very substantial amounts of money during the time the applications are pending.

In addition to properly coordinating the relative incentives, the relief structured by the Court is also fair. Relative foster caregivers will have a reasonable opportunity to present their claim for continued benefits so that they would be treated the same as non-relative foster caregivers.[19] On the other hand, the intrusion into the State's system of foster care is minimal. The Court does not interfere in any way with the State's ability to have the HMR Reform take effect on July 1, 1995, including changes in the definition of "neglect," the elimination of "non-removal" placements, increased licensure requirements such as six hours of training and a medical check, and many other changes. The Court emphasizes that none of the relief specified in this opinion applies to new participants in the DCFS system. Relief applies only to unlicensed caregivers who received full foster care benefits under the pre-HMR Reform system. The relief provided here is the minimum necessary to satisfy due process and the Judgment Order. DCFS, by granting unlicensed homes foster care benefits under the pre-HMR Reform system, voluntarily shouldered the burden of procedural fairness with respect to those caregivers and now must honor that responsibility. Because the restriction the Court places on the State's ability to implement HMR Reform is limited

---

**18.** Each notice must include an application for a license, regardless of the current status of the relative foster home. This requirement represents a change from DCFS's practice to date, under which applications were sent only to those homes that were already approved.

**19.** This opportunity is especially important because many relative foster care providers rely on full foster care payments to maintain their housing and the standard of living provided to the foster children. Plaintiffs provided the uncon-

tested testimony of ten foster caregivers, each of whom described the impact a reduction in benefits would have upon the foster children and the foster care families. Each caregiver witness, as well as Plaintiffs' expert witnesses, testified that a drop in payments would result in harm to the foster children affected. *See, e.g.*, Gleeson Direct, pp. 9, 15, 20; Grimes Direct, p. 27; Campbell Direct, p. 5; Collins Direct, p. 5; Sumner Direct, p. 5.

to the financial effect on unlicensed relative caregivers and will last only as long as it takes DCFS to process pending applications for licensure, the cost to the State will be substantially less than estimated. In any event, the extent of the expense is placed within the control of DCFS.

The Court directs Plaintiffs to submit, as they have volunteered to do, a draft decree reflecting the decisions set forth herein by July 7, 1995. Defendant may also submit a draft decree and/or objections to the form of the decree by July 11. The Court sets a hearing and ruling date of July 12, 1995 at 4:00 p.m.

In this case, there are at least one state court decree and two federal court decrees that impact on the HMR Reform implementation. Through this proceeding, the Court has been made aware of the administrative problems that are created by long-standing, unending court decrees. When the transition period to HMR Reform has been completed, the Court would entertain further proceedings on what portion, if any, of the 1976 decree should remain in effect and for what period of time.

## CONCLUSION

For the reasons given in this opinion, Plaintiff's Motion to Adjudicate Director McDonald in Civil Contempt is DENIED. Plaintiffs' Motion for Supplemental Relief is GRANTED. All other motions made in the course of this litigation are DENIED.