Linda M. SIMMONDS, Plaintiff,

v.

Larry G. MASSANARI [1], Commissioner of Social Security, Defendant.

No. 99–4067–RDR.

United States District Court, D. Kansas.

July 20, 2001.

1. On March 29, 2001, Larry G. Massanari became acting Commissioner of Social Security. The court shall substitute Mr. Massanari for Kenneth F. Apfel as the defendant in this action.

Steven M. Tilton, Tilton & Tilton, LLP, Topeka, KS, for Plaintiff.

Jackie A. Rapstine, Office of U.S. Atty. Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action to review a final decision by the Commissioner of Social Security regarding plaintiff's entitlement to disability insurance benefits and supplemental security income (SSI) benefits under the Social Security Act. The parties have briefed the relevant issues and the court is now prepared to rule.

### I.

Plaintiff filed her applications for disability benefits and SSI benefits on December 8, 1995. She alleged that her disability began on April 7, 1993. Plaintiff indicated that she was disabled due to carpal tunnel, shoulder problems, myo-

fascial pain and depression. Plaintiff's applications were denied initially and on reconsideration by the Social Security Administration (SSA). Upon plaintiff's request, a hearing was conducted by an administrative law judge (ALJ). On March 19, 1997, the ALJ determined in a written opinion that plaintiff was not disabled. On April 8, 1999, the Appeals Council of the SSA denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.

■■■■ This court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied. *Castellano v. Secretary of Health & Human Services*, 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Soliz v. Chater*, 82 F.3d 373, 375 (10th Cir.1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but we have the duty to carefully consider the entire record and make our determination on the record as a whole. *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir.1987).

■■■■ The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. *Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir.1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir.1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. *Id.*

## III.

Plaintiff was born on August 4, 1952. She attended school until the tenth grade. She later received a GED. She has previously worked as an electronic assembler and a cashier. From 1978 to 1993, she worked as a key reader for Luce Press Clippings. She has not worked since April 7, 1993.

The medical records are extensive. There are entries from 1991 to 1996. In 1991, plaintiff had carpal tunnel surgery on her right wrist and her left wrist. Following those surgeries, she was released to return to work with the restriction of frequent breaks to decrease her arm pains. Upon her return to work, she continued to suffer pain. After approximately one year, she could not tolerate the pain any longer. She went to her treating physician, Glenn Bair, M.D., for treatment. He referred her to several other doctors for examination.

Plaintiff was seen by Herb A. Strain, M.D., on October 12, 1992. Dr. Strain diagnosed over-use syndrome. He, however, wanted to rule out recurrent nerve compression syndromes. He prescribed anti-inflammatory medications and analgesics. In January 1993, Dr. Strain noted very little improvement. He diagnosed possible cubital tunnel syndrome as well as possible recurrent carpal tunnel syndrome. Dr. Strain then referred plaintiff to James S. Zarr, M.D., for further evaluation and management.

On January 19, 1993, plaintiff was examined by Dr. Zarr. Dr. Zarr's examination found that plaintiff's range of motion in all major joints throughout both upper extremities was within normal limits. He noted no redness, warmth or swelling of any of the major joints of both upper extremities. He also noted the following:

> Finkelstein's test causes moderate discomfort but does not recreate the symp-

toms of her chief complaint. She does have significant tenderness to palpation over the trapezius ridges, pectoral muscles and shoulder girdle muscles bilaterally as well as to a milder extent over the biceps and triceps bilaterally. She does not have a significant amount of tenderness in the muscle groups of the forearms bilaterally. The patient related that I recreated the symptoms of her chief complaint by pushing over the tender muscles in the shoulder girdles, particularly the pectoral muscles.

Dr. Zarr's impression was that plaintiff suffered from myofascial bilateral shoulder and upper arm pains and status-post bilateral carpal tunnel surgical releases. He recommended that plaintiff begin a daily outpatient physical therapy program with hot packs, manual massage, modalities as needed, and with emphasis on myofascial release techniques to the involved shoulder girdle and upper arm muscles. He requested that these therapies last three to four weeks.

On February 25, 1993, plaintiff was seen by Dick Geis, M.D., at Midwest Occupational Health Services. He diagnosed "myofascial pain syndrome/chronic pain syndrome." He indicated that plaintiff was motivated to take control of her pain and would be an appropriate candidate for an outpatient pain management program. Thereafter, plaintiff did participate in a behavioral pain management program. The following notes were made at the conclusion of this program:

> Ms. Simmonds made few major gains in the pain program. Overall functional activity level (walking, range of motion, bicycle, etc.) has improved some but is still at a low level.

> With relaxation she has learned to reduce her pain level somewhat but it remains high.

Psychologically, Ms. Simmonds is able to superficially recognize some components of her pain.

The pain management team feels Ms. Simmonds can safely return to DOT sedentary work although increased discomfort may be expected. We would recommend 5–10 minutes of rest for every 25–30 minutes of repetitive arm work.

Plaintiff was seen again by Dr. Zarr on April 6, 1993. Plaintiff told him that she had not noted any significant improvement. Upon examination, Dr. Zarr noted that plaintiff continued to have tenderness to palpation in the shoulder girdle muscles and to a lesser degree in the upper arm muscle groups bilaterally. He concluded that her pain seems to be myofascial in origin. He noted that he had nothing further to offer plaintiff in terms of treatment. He felt that plaintiff had reached her maximum medical improvement. He determined that she had suffered a five percent whole body permanent impairment rating for her myofascial shoulder and upper arm pains bilaterally. Dr. Zarr released plaintiff to return to work on April 7, 1993 with the restriction of sedentary work, i.e., no lifting or carrying greater than ten pounds, with five to ten-minute breaks after every thirty minutes of repetitive arm activities.

On August 10, 1994, Dr. Zarr reviewed his recommendations concerning plaintiff's work restrictions. After viewing a videotape of plaintiff's job duties at Luce Press Clippings, he determined that her job as a key reader fell within the work restrictions he had imposed on April 6, 1993. He found that plaintiff could take a five-minute break once an hour as opposed to every thirty minutes after repetitive arm activities.

On March 7, 1995, plaintiff was examined by P. Brent Koprivica, M.D. Dr. Ko-

privica found no evidence that plaintiff's current complaints of pain and fatigue in her shoulders and numbness in her fingers were recurrent bilateral carpal tunnel syndrome. He found that her problems were work-related. He concluded that her work was a substantial factor in the development of the cumulative trauma disorder manifested as a chronic myofascial pain syndrome involving the parascapular, parathoracic and paracervical muscle groups. He found that plaintiff should be restricted to sedentary work with an allowance of a five to ten-minute break from upper extremity activities every thirty minutes. He noted that these restrictions were permanent. He found that plaintiff had suffered a 13 percent whole person impairment.

On January 20, 1996, plaintiff was seen by Daniel Thompson, M.D., for a consultative physical examination. During his examination, Dr. Thompson noted that plaintiff had pain in her wrists, hands, shoulders and cervical spine. He diagnosed "arthralgias, status post carpal tunnel." He made the following observations:

The patient has a history of low back, neck, bilateral shoulder and wrist pain. She is status post surgical repair of both wrists. Today shows pain in the wrists with full range of motion, good grip strength and dexterity. No interosseous atrophy noted. Gait and station are stable. Pain in the neck as well as both shoulders. Restricted range of motion of 20 degrees in the shoulders. No inflammatory change, erythema, or hyperthermia is noted. X-ray of the right shoulder shows no acute traumatic or intrinsic osseous abnormalities. Joint spaces are well maintained with no discernible marginal spurring, eburnation, or erosive change along opposing surfaces. Surrounding soft tissues are intact.

On May 7, 1996, plaintiff was seen by Stanley I. Mintz, Ph.D. Dr. Mintz conducted a psychological examination of plaintiff. He diagnosed plaintiff's mental condition as mild dysthymia. He determined that her current Global Assessment Functioning (GAF) was 70, with her highest GAF in the past year as 70. A GAF of 70 indicates only mild psychological symptoms. He made the following comments:

Ms. Simmonds appears depressed but she does not appear to exhibit any other pattern of psychopathology. She appears able, from a psychological point of view, to relate adequately to co-workers and supervisors. She appears able to understand simple and intermediate instructions. Her concentration capacity may be variable due to pain and discomfort symptoms. She appears capable of handling her own funds.

Plaintiff sought treatment at the Shawnee County Mental Health Center in July 1996. She was diagnosed with depression and referred for therapy. She was also prescribed Zoloft, an anti-depressant. She made some improvement by December 1996 with an increase in medication dosage.

At the hearing before the ALJ, plaintiff testified that she was five feet two inches and weighed 231 pounds. She stated that she had gained about 50 pounds as a result of her depression. She is able to drive an automobile, but only for short distances. She must stop after a short distance because her shoulders and neck hurt. She is right-handed and she presently has problems with her right hand and arm. They go numb and she has little strength in her hand. She has considerable difficulty writing. The pain affects her ability to use her right hand. It causes her to drop items shortly after she has picked them up. She has more strength in her left hand. She

stated that she is able hold things longer with her left hand.

Plaintiff stated that she suffers almost constant pain in her arm and shoulders. She indicated that the pain lessens at times, but it does not completely go away. She has tried various exercises that her doctors have recommended, but they have not helped. She stated that she believed her average pain level was a seven on a scale of one to ten with ten being so bad that she had tears in her eyes. She currently takes Ibruprofen 800s and Darvocet for the pain.

Plaintiff testified that she has trouble standing for longer than five minutes. After that period, her pain in her neck and shoulders becomes too severe. She stated that she is only able to walk two blocks. She has difficulty bending and climbing stairs. She also has problems sleeping. She, however, has no difficulty seeing or hearing.

Plaintiff also testified that she has problems with concentration. She has been taking Zoloft for her depression and thoughts of suicide. She stated that her prescribed medications, Darvocet and Zoloft, make her feel "out of it." She indicated that she only took the Darvocet when it was "absolutely" necessary.

Plaintiff's husband, Linden Simmonds, also testified at the hearing before the ALJ. He testified that plaintiff is in constant pain and that she has little desire to do anything or leave the house. He also indicated that plaintiff has considerable difficulty sleeping. He noted that she has at times cried a lot, but this has decreased somewhat since she began taking the Zoloft.

Lisa Keen, a vocational expert, testified in response to a hypothetical question which assumed plaintiff's age, education and work experience. The hypothetical also assumed the following limitations: (1) light work with simple repetitive tasks only; (2) only occasional lifting and hand motions; and (3) no lifting of the hands above shoulder level. Ms. Keen determined that plaintiff could perform work as a photocopy machine operator, parking lot cashier, surveillance systems monitor, information clerk and ticket seller/taker.

The ALJ determined that plaintiff did not suffer from a listed impairment, but that she did suffer from the following impairments: "status post bilateral carpal tunnel syndrome surgeries in 1991 with residual normal electromyography findings, normal range of motion, good grip strength and dexterity and no more than mild symptoms; has complaints of a frozen shoulder without objective evidence of any underlying impairment other than some impingement findings with normal x-rays; and has major depression without psychotic features, first diagnosed in July 1996 and not expected to last for 12 continuous months while claimant takes her medications." The ALJ found that the testimony of the plaintiff and her husband were only partially credible. The ALJ determined that plaintiff retained a residual functional capacity to perform a range of light work where she is restricted to simple repetitive tasks only with no more than occasional lifting and occasional repetitive hand motions and wrist motions up to one-third of the work day. The ALJ found that plaintiff could not perform her past relevant work but that she could perform the jobs noted by the vocational expert during the hearing and that these jobs exist in significant numbers in the local and national economies. Accordingly, the ALJ concluded that the plaintiff was not disabled.

## IV.

Plaintiff contends that the ALJ (1) failed to properly evaluate plaintiff's subjective pain complaints; (2) failed to properly

evaluate the credibility of plaintiff and her husband; (3) failed to properly evaluate plaintiff's depression; and (4) failed to properly examine the vocational expert concerning plaintiff's limitations.

Having carefully reviewed the evidence, the court finds it necessary to remand this case for further proceedings. The court finds no merit to some of the arguments raised by the plaintiff. For example, the court finds that the ALJ properly evaluated the plaintiff's depression. The court finds substantial evidence in the record for the findings made by the ALJ concerning plaintiff's mental impairments. However, the court finds fault with the ALJ's evaluation of plaintiff's subjective pain complaints and her evaluation of plaintiff's credibility. The court finds certain errors in the ALJ's opinion that require remand for additional consideration.

The ALJ found plaintiff only "partially credible." In reaching this determination, the ALJ mentioned the following factors concerning plaintiff as support: (1) she applied for unemployment benefits which require a statement that the applicant is able and willing to work; (2) she received a workers compensation award which may have reduced her motivation to return to work; (3) she has not been found to be disabled by any treating or examining physician; (4) she did not receive or seek any treatment between January 11, 1993 and March 7, 1995; (5) she underwent bilateral carpal tunnel surgery in 1991 but electromyography testing in January 1993 was normal, "indicating an excellent recovery;" (6) she has been diagnosed as suffering from myofascial pain syndrome but x-rays were within normal limits; (7) range of motion of her wrists were within normal limits and she had good grip and dexterity; (7) she is not taking any significant pain medication regimen nor has one been recommended; (8) she has not sustained any adverse side effects from her medications;

and (9) she continues to engage in a range of activities which is inconsistent with disability.

■ " 'Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence.' " *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995) (quoting *Diaz v. Secretary of Health & Human Services*, 898 F.2d 774, 777 (10th Cir.1990)). However, " '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.' " *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir.1988) (footnote omitted)).

■ The ALJ recited all of the factors she was required to consider with regard to plaintiff's claim of pain, but her decision does not reflect that she properly considered all of these factors. She failed to adequately consider some of them, and some of her credibility determinations were not closely and affirmatively linked or connected to substantial evidence. The court begins by noting that the ALJ improperly relied upon plaintiff's receipt of workers' compensation benefits to discredit her testimony. In *Hinton v. Massanari*, 2001 WL 744971 at * 1 n. 1 (10th Cir.2001), the Tenth Circuit stated:

This statement ["the monies she has received and might receive with respect to the Workers' Compensation claim may possibly have given claimant less motivation to return to the work force"] was improper and undercuts the objectivity of the ALJ's opinion. Congress drafted the social security statutes with the expectation that claimants could receive both workers' compensation and disability benefits for on-the-job injuries. See 42 U.S.C. § 424a; *Richardson v. Belcher*, 404 U.S. 78, 82–83, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). Thus, Ms. Hinton's

receipt of such benefits has no bearing on her credibility. Cf. *Eichel v. N.Y. Cent. R.R.*, 375 U.S. 253, 255, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963) ("it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act ... were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act").

■ The court also finds that the ALJ's determination that the range of activities engaged in by plaintiff was inconsistent with her claim of disability is not supported by substantial evidence. In her decision, the ALJ's only account of plaintiff's activities was a summary of her daily activities, which she found as follows:

> With regard to activities of daily living, claimant testified that she gets up, fixes herself breakfast and then watches television. She testified that she does nothing else in the morning except for occasional household chores including some laundry, vacuuming for two to three minutes only, and some sweeping, with stopping and resting in between. She fixes lunch which is generally just a sandwich. She testified that she does nothing after lunch and then sits down again if she has moved her shoulders and arms around. She testified that she has no hobbies or outside activities.

The court is at a loss how these daily activities are inconsistent with a claim of disability. The ALJ points to no other activities which are inconsistent with plaintiff's claimed limitations. The court's review of the records fails to disclose any such evidence. In fact, the evidence concerning her activities corroborates, rather than contradicts, her account. Accordingly, the court finds that the ALJ erred in discounting plaintiff's credibility and her subjective pain complaints on this basis.

■ The court next turns to the ALJ's discounting of plaintiff's testimony because she failed to seek or receive any medical treatment between January 1993 and March 1995. In general, such a failure reflects on a plaintiff's credibility regarding the magnitude of a complaint. However, in this instance the court finds that the ALJ improperly failed to consider the surrounding circumstances. Plaintiff did not seek any treatment after January 1993 because she had seen a number of physicians and had been told that she had reached the maximum level of medical improvement. The ALJ failed to note any instance where the plaintiff had not followed recommended treatment. The record suggests that plaintiff made every effort to comply with the demands of her physicians and pursued all suggested treatment and medication. The ALJ's use of the lack of treatment for the designated period under these circumstances is improper.

■ The ALJ also discounted plaintiff's credibility because she found that x-rays did not confirm plaintiff's myofascial pain. The court finds that this medical evaluation by the ALJ is improper. Myofascial is "[o]f or relating to the fascia surrounding and separating muscle tissue." Stedman's Medical Dictionary 1168 (26th ed.1995). "Fascia" is a "sheet of fibrous tissue that envelops the body beneath the skin; it also encloses muscles and groups of muscles, and separates their several layers or groups." Id. at 628. The court find no evidence in the record that myofascial pain would be shown in x-rays. The doctors who examined plaintiff made a diagnosis of myofascial pain without any evidence of such in an x-ray.

■ Finally, the court must consider the ALJ's finding that plaintiff was not involved with any significant pain medication regimen. The ALJ's decision on pain medication is supported by substantial evidence. The evidence shows that

plaintiff does not have a significant pain medication regimen. She does take both Ibuprofen and Darvocet, but she only does so on an as needed basis. She attempts to avoid the Darvocet because of its side effects. Although the court believes that the ALJ accurately considered whether plaintiff was involved with a significant pain medication regimen, the court does not find that the ALJ properly considered the side effects of plaintiff's pain medication or the medication taken by plaintiff for her depression. The court believes that the ALJ needs to consider these side effects to properly consider plaintiff's ability to perform substantial gainful activity. In sum, many of the reasons given by the ALJ for rejecting plaintiff's contention of disabling pain are either not supported by substantial evidence or not relevant. The court believes that a remand to the Commissioner is necessary for further proceedings. A remand is necessary because the medical evidence regarding the severity of the plaintiff's impairment was not overwhelming in either direction. In remanding the case, the court does not intend to dictate any result, nor do we mean to imply that plaintiff's complaints are necessarily credible. We require only that findings be supported by substantial evidence.

**IT IS THEREFORE ORDERED** that this action be hereby remanded to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**